IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

**FILED**

**April 7, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Nos. 14-0749 and 15-0009

LAWYER DISCIPLINARY BOARD,
Petitioner,

v.

HEIDI M. GEORGI STURM,
Respondent.

Lawyer Disciplinary Proceeding
Nos. 12-05-267; 12-05-268 and 14-05-346

LAW LICENSE SUSPENDED AND OTHER SANCTIONS

Submitted:  February 23, 2016
Filed:  April 7, 2016

Jessica H. Donahue Rhodes, Esq.               Heidi M. Georgi Sturm, Esq.
Lawyer Disciplinary Counsel                   Fairmont, West Virginia
Office of Disciplinary Counsel                Respondent, Pro se
Charleston, West Virginia
Counsel for the Petitioner

JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.     "'A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.' Syl. Pt. 3, *Comm. on Legal Ethics of the West Virginia State Bar v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994)." Syl. Pt. 1, *Lawyer Disciplinary Bd. v. Conner*, 234 W. Va. 648, 769 S.E.2d 648 (2015).

2.     "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics of The W. Va. State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

3.     "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In

i

imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syl. Pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

4.      "Although Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates the factors to be considered in imposing sanctions after a finding of lawyer misconduct, a decision on discipline is in all cases ultimately one for the West Virginia Supreme Court of Appeals. . . ." Syl. Pt. 5, in part, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

5.      "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. Pt. 2, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

6.    "Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses."  Syl. Pt. 3, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

7.    "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed."  Syl. Pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

8.    """In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public

confidence in the ethical standards of the legal profession." Syllabus Point 3, *Committee on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).' Syl. Pt. 5, *Committee on Legal Ethics v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989)." Syl. Pt. 7, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

Workman, Justice:

This lawyer disciplinary proceeding involves two separate Statements of Charges[1] issued against the Respondent Heidi M. Georgi Sturm by the Investigative Panel of the Lawyer Disciplinary Board ("the LDB"). The LDB's Hearing Panel Subcommittee ("the HPS") determined that Ms. Sturm committed violations of the West Virginia Rules of Professional Conduct[2] in connection with each action filed against her. The HPS recommended as sanctions for the Brown/Wright-Ochoa case that Ms. Sturm be reprimanded, subjected to supervised practice for a period of two years, required to refund the retainer fee, and required to pay the costs of the disciplinary proceeding. The HPS recommended as sanctions for the Greynolds case that Ms. Sturm be reprimanded and pay the costs of the disciplinary proceedings. Pursuant to Rule 3.12 of the West Virginia Rules of Lawyer Disciplinary Procedure,[3] the Court did not concur with the recommended

---

[1]The first Statement of Charges concerns case No. 14-0749 involving complainant Lael Brown and complainant Laverne G. Wright-Ochoa. We refer to this first action throughout the opinion as the "Brown/Wright-Ochoa case." The second Statement of Charges involves case No. 15-0009 and was brought by complainant Kenneth L. Greynolds. This case will be referred to as the "Greynolds case." The Court consolidated the two cases by order issued November 3, 2015.

[2]The West Virginia Rules of Professional Conduct were amended by this Court by order dated September 29, 2014, with a January 1, 2015, effective date for the amended rules to take effect. Because Ms. Sturm's conduct occurred prior to January 1, 2015, the former version of the rules govern this case.

[3]Rule 3.12 of the West Virginia Rules of Lawyer Disciplinary Procedure provides that
(continued...)

1

disposition of the HPS in the two lawyer disciplinary actions and scheduled oral argument. The Court has before it the recommendations of the HPS, the parties' briefs and oral arguments, and all matters of record. Based upon our review, we find clear and convincing evidence to support the factual findings of the HPS.[4] We disagree, however, with the HPS's recommended sanctions of reprimand for each case and, accordingly, impose a ninety-day suspension of Ms. Sturm's law license and adopt the remaining sanctions recommended by the HPS.

## I. FACTUAL AND PROCEDURAL HISTORY

Ms. Sturm has been a practicing member of the West Virginia State Bar since her admission on October 9, 2003. Ms. Sturm's conduct at issue in the disciplinary proceeding occurred while she was practicing in Fairmont, West Virginia. The two cases at issue are briefly discussed below.

### A. Brown/Wright-Ochoa Case

On August 17, 2010, Ms. Laverne G. Wright-Ochoa met with Ms. Sturm about retaining her to represent Ms. Wright-Ochoa's son, Lael Brown, who was incarcerated. Ms.

---

[3](...continued)
"[i]f the Court does not concur with the recommended disposition, the Clerk of the Supreme Court of Appeals shall promptly establish a briefing schedule and notify the parties of the date and time of oral argument . . . before the Supreme Court of Appeals."

[4]Rule 3.7 of the West Virginia Rules of Disciplinary Procedure requires allegations of formal charges against a lawyer be proven by "clear and convincing evidence" in order to recommend the imposition of discipline.

Wright-Ochoa wanted to institute a habeas corpus proceeding for her son. On August 23, 2010, Ms. Sturm mailed Ms. Wright-Ochoa an "Attorney-Client Hourly and/or Flat Fee Agreement." That agreement provided for Ms. Wright-Ochoa to pay Ms. Sturm a general retainer of $5,000. On August 27, 2010, Ms. Wright-Ochoa signed the retainer agreement and returned it to Ms. Sturm. The record indicates that Ms. Wright-Ochoa gave Ms. Sturm the full retainer amount of $5,000 in three different installments agreed upon by the parties.[5]

Between August 27, 2010, and September 10, 2010, Ms. Wright-Ochoa emailed Ms. Sturm about the time frames for filing a petition for habeas corpus for her son and sent her documents regarding Mr. Brown's case. When Ms. Sturm failed to respond to her inquiries, Ms. Wright-Ochoa sent Ms. Sturm a letter on September 22, 2010, regarding Ms. Sturm's failure to communicate with her and Mr. Brown. Ms. Wright-Ochoa then attempted to contact Ms. Sturm. Ms. Sturm responded to her that same day by email, stating that she had been out of town for court and could not return any telephone calls. Ms. Sturm sent Ms. Wright-Ochoa another email two days later, indicating that she had received Ms. Wright-Ochoa's messages, but had been unable to respond to her. She further stated in the email that she should have the petition for habeas corpus completed "by the beginning of

_____

[5]The record also establishes that Ms. Sturm deposited some of the retainer received into her business account and not into a client trust account.

3

next week" and that she would need to review the petition with Mr. Brown in order to obtain his signature before she could file it in the circuit court.

Ms. Wright-Ochoa emailed Ms. Sturm the day after receiving Ms. Sturm's second email. Ms. Wright-Ochoa told Ms. Sturm that she had not received a signed copy of the fee agreement and she requested to meet with her on October 1, 2010, because Ms. Wright-Ochoa would be in town for a hearing concerning Mr. Brown. Ms. Wright-Ochoa also sent the attorney additional information about Mr. Brown's case.

On September 28, 2010, Ms. Sturm responded to Ms. Wright-Ochoa's email, indicating that she would leave a copy of the signed fee agreement for her to pick up. Ms. Sturm was also going to leave a copy of the petition for habeas corpus for Ms. Wright-Ochoa's review and another copy for Ms. Wright-Ochoa to provide to Mr. Brown for review. On that same day, Ms. Wright-Ochoa sent a letter to Ms. Sturm, again requesting a meeting as they had not met since the initial consultation in August.

In an email that was sent the next day, September 29, 2010, Ms. Wright-Ochoa informed Ms. Sturm that she would be unable to stop by her office prior to meeting with Mr. Brown. Ms. Wright-Ochoa also sent Ms. Sturm additional documents about the case and expressed to Ms. Sturm that she was upset because she wanted to meet with Ms. Sturm. The

4

same day, Ms. Sturm sent Mr. Brown a copy of the petition for habeas corpus that she had prepared for him to review. Ms. Sturm had not visited Mr. Brown, but stated in the communication included with the petition that she was going to visit him soon to discuss the petition with him and have him sign it.

On October 1, 2010, Ms. Wright-Ochoa again emailed Ms. Sturm asking for a meeting as they had not meet since the original meeting. Three days later, Ms. Sturm answered Ms. Wright-Ochoa's email and stated that she had other clients and matters to work on and that she did "not have time to sit at [her] desk waiting for emails from" Ms. Wright-Ochoa. Ms. Sturm further indicated that the process with the habeas petition could take some time and that she would meet with her the next time she was in town.

On October 4, 2010, Ms. Wright-Ochoa received a draft of the habeas petition. She made comments and sent them back to Ms. Sturm. Ms. Sturm indicated to Ms. Wright-Ochoa that she would make various changes and send her a copy of the final petition within a few weeks. Throughout the remainder of October, there were various communications between Ms. Sturm and Ms. Wright-Ochoa about setting up another appointment and sending a filing fee for the petition, which Ms. Wright-Ochoa agreed to do and did do[6] at the end of the month.

---

[6]Ms. Sturm never cashed the $200 check, dated October 15, 2010, for the filing fee.

5

In early November, there were additional communications between Ms. Wright-Ochoa and Ms. Sturm, including Ms. Wright-Ochoa sending Ms. Sturm additional documents about her Mr. Brown's case and requesting a meeting so that Ms. Sturm could explain the matter to her son's father. Around November 11, 2010, Ms. Sturm indicated in an email to Ms. Wright-Ochoa that the petition for habeas corpus would be ready by the end of the next week.

In a November 24, 2010, email to Ms. Sturm, Ms. Wright-Ochoa inquired about whether Ms. Sturm had visited Mr. Brown or completed the petition. Ms. Sturm responded that she was sorry that she had not provided the petition to Ms. Wright-Ochoa sooner, but her children had been sick and she had been dealing with several family friends who had passed away.

Another month passed during which Ms. Wright-Ochoa sent Ms. Sturm more documents about her son's case, as well as requested information about the petition. Ms. Sturm did not respond to Ms. Wright-Ochoa until January 25, 2011, when she emailed Ms. Wright-Ochoa. According to the email, Ms. Sturm's daughter needed surgery over the Christmas holiday and Ms. Sturm was still working on the petition–the petition that Ms. Sturm had told Ms. Wright-Ochoa would be completed before Thanksgiving.

6

On February 22, 2011, Ms. Wright-Ochoa informed Ms. Sturm that Mr. Brown was ineligible for parole. Then, during the first week of March, Ms. Wright-Ochoa inquired about the status of the petition for habeas corpus on two different occasions. Ms. Sturm failed to respond to the inquires until March 22, 2011, again telling Ms. Wright-Ochoa that the completed habeas petition "should" be competed by the end of the month.

Several month passed until July 12, 2011. By certified letter on that date from Ms. Wright-Ochoa to Ms. Sturm, Ms. Wright-Ochoa states that she had not heard from Ms. Sturm since March, that she had not received the habeas petition for Mr. Brown, and that Ms. Sturm had not visited Mr. Brown to get his input regarding the petition.

On that same date, Mr. Brown also sent a letter to Ms. Sturm requesting a refund of the $5,000 retainer that his mother had paid to her. Mr. Brown also indicated that he had not received any communication from Ms. Sturm since October of 2010, wherein she indicated that she would visit with him to go over the habeas petition. Mr. Brown also requested an accounting of the fees and itemization of costs. Another month passed and on August 2, 2011, Ms. Wright-Ochoa sent a second certified letter requesting refund of the unearned attorney fees and itemization of costs.

Finally, on August 18, 2011, Mr. Brown, pro se, filed a petition for habeas corpus in Monongalia County, West Virginia.

Ms. Wright-Ochoa and Mr. Brown went several more months without any communication from Ms. Sturm. On February 10, 2012, Ms. Wright-Ochoa called Ms. Sturm's office and discovered that Ms. Sturm's office phone was disconnected. Ms. Wright-Ochoa, upon discovering through another attorney that Ms. Sturm's office phone was back in service, made several phone calls to Ms. Sturm's office leaving messages, none of which were returned by the attorney.

After the passage of several more months with no communication from Ms. Sturm, on May 3, 2012, Ms. Wright-Ochoa and Mr. Brown filed complaints against the attorney with the Office of Disciplinary Counsel ("the ODC"). The complaints were opened for investigation and the ODC asked Ms. Sturm to file a response. On May 24, 2012, Ms. Sturm's response was received by ODC. Ms. Sturm admitted that she agreed to represent Mr. Brown; that Ms. Wright-Ochoa was very involved in the case; that she had spent at least eighteen to twenty hours on the case; that she had met with Ms. Wright-Ochoa on Saturdays when she was in town, which meetings "usually lasted one to two hours[;]" that she had received a lot of emails, letters, and documents from Ms. Wright-Ochoa; that she had provided a draft of the habeas petition to Ms. Wright-Ochoa, who had made changes that Ms.

8

Sturm had incorporated into the petition; that she not heard from Ms. Wright-Ochoa for several months; that she had provided another copy of the draft petition to Ms. Wright-Ochoa, but had not gotten any response; that Ms. Sturm did not want to file the petition without receiving a response from Ms. Wright-Ochoa; that Ms. Sturm was ready to file the petition if Ms. Wright-Ochoa gave her permission; and that she had sent a copy of the petition to Mr. Brown and had never received a response from him.

By letter dated June 12, 2012, the ODC requested Ms. Sturm to answer the following questions concerning the complaint: 1) what was the status of the petition; 2) why was Ms. Sturm's office telephone service cut off; and 3) what was Ms. Sturm's response to the allegation of her failure to communicate. The ODC also asked Ms. Sturm to provide an accounting of the work performed in the case.

Ms. Sturm failed to respond to the June 12, 2012, letter. By letter dated June 26, 2012, the ODC asked the Respondent if she ever explained the habeas process to Mr. Brown and again requested an accounting of the work performed. Ms. Sturm again failed to answer the second letter from ODC.

On August 9, 2012, the ODC sent additional letters by both certified and regular mail to Ms. Sturm again requesting answers to the above-mentioned inquiries. By

9

letter dated August 16, 2012, Ms. Sturm finally responded to the ODC's inquiries, by first apologizing for her failure to respond earlier. She stated that "[d]ue to several transitions in . . . [her] office, this particular correspondence was not properly filed for . . . [her] to address." Ms. Sturm answered the ODC's inquiries, stating that the petition was ready to file; that there was a brief disruption in her phone service that was remedied as soon as she became aware of it;[7] and that she did return Ms. Wright-Ochoa's emails and phone calls. Ms. Sturm also provided an accounting of work performed as follows: "Telephone, email conferences[:] 4.1 hours[;]Review of documents from L.W.O[:] 11.3 hours[;] Research: 7.8 hours[;] Draft Petition: 8.7 hours[;] In-person conferences w/clients[:] 1.7 hours[.]" Ms. Sturm indicated that she had spent additional time on this case, but did not bill for it. She also stated that she had not included the costs for copies and postage and that she had "consulted other counsel about this case for additional insight into the Petition as well as advice on specifics that make a petition successful."

Mr. Brown testified that he was released from incarceration in January of 2013 after completing his sentence. By letter dated January 30, 2014, about a year later, ODC requested a status report of Mr. Brown's case. Ms. Sturm again failed to respond. By letter dated February 25, 2014, ODC sent another letter by certified and regular mail requesting the

---

[7]Interestingly, Ms. Sturm commented that she was "not quite sure why Ms. Wright-Ochoa is alleging my telephone service was inactive and at what time that allegedly occurred." Ms. Sturm, however, did not explain why there was a service disruption.

10

same information. Ms. Sturm responded to this letter that she had had no contact with Ms. Wright-Ochoa due to the pending ethics complaint and that she could provide a copy of the habeas petition to Ms. Wright-Ochoa.

## B. Greynolds Case

Ms. Sturm previously had represented Kenneth L. Greynolds in criminal matters before the case at issue. On December 12, 2012, she represented him in a criminal proceeding in which Mr. Greynolds accepted a plea offer and pled guilty[8] to three felonies. Mr. Greynolds was sentenced for the crimes. Thereafter, Mr. Greynolds decided that he wanted to appeal his convictions.

On January 15, 2013, the circuit court appointed Ms. Sturm to represent Mr. Greynolds "for the purpose of filing an appeal." In the order of appointment, the court further directed that Ms. Sturm "is instructed to contact the defendant forthwith."

By letter dated January 17, 2013, Ms. Sturm, without ever meeting with Mr. Greynolds to discuss his desire to appeal his criminal convictions, wrote the following to him: "I have reviewed the case file and the plea and sentencing order. There are no grounds

---

[8]The plea was a *Kennedy* or *Alford* plea wherein Mr. Greynolds did not have to admit guilt to any of the crimes. *See Kennedy v. Frazier*, 178 W. Va. 10, 357 S.E.2d 43 (1987) and *North Carolina v. Alford*, 400 U.S. 25 (1970).

11

for you to appeal this order. There is no question as to jurisdiction, the sentence or whether you wished to enter the plea. Therefore, there are no legitimate grounds upon which to appeal."

Mr. Greynolds denied ever receiving the foregoing letter. After sending the letter, Ms. Sturm took no action regarding Ms. Greynolds' appeal. Because of Ms. Sturm's inaction, Mr. Greynolds twice wrote to the circuit court – in June 2013 and in June of 2014. In June 2013, Mr. Greynolds indicated that he had attempted to contact Ms. Sturm on several occasions without success. In June 2014, Mr. Greynolds asked that a new attorney be appointed. On June 10, 2014, the circuit court responded to Mr. Greynolds regarding his request for a new attorney. The circuit court informed Mr. Greynolds that the time frame to appeal had passed and that the court would not appoint new counsel to represent him.

Mr. Greynolds filed an ethics complaint on June 25, 2014, alleging that his post-conviction rights had been violated by Ms. Sturm. Specifically, Mr. Greynolds alleged, inter alia, that Ms. Sturm had failed to file for suspension of execution of his sentence and thereby prevented his release on probation; failed to file for correction or reduction of sentence; failed to file a notice of appeal with the West Virginia Supreme Court; and failed to file a petition for appeal with this Court.

The ODC wrote to Ms. Sturm on June 30, 2014, asking for a response to Mr. Greynolds' complaint. Ms. Sturm failed to respond. By letter dated July 29, 2014, sent by both certified and regular mail, the ODC again requested Ms. Sturm to respond to the complaint filed against her.

The ODC received three responses from Ms. Sturm dated August 1, 2014, September 19, 2014, and September 26, 2014. In her responses, Ms. Sturm stated she had provided Mr. Greynolds with a copy of the plea and sentencing order that was entered in his case. Ms. Sturm indicated that the order was initially returned to her office and that she "had forwarded it to Mr. Greynolds at Huttonsville." Ms. Sturm also stated that she had informed Mr. Greynolds, by letter dated January 17, 2014, that she "would not be able to appeal this decision as there was no issue relating to the jurisdiction, the sentence, or the voluntariness of entry of the plea as he did not choose to take the matter to trial and instead entered to a plea and sentencing agreement." As Ms. Sturm told the ODC in a subsequent letter,

> [a]s I am required to certify an appeal by signing the statement "I hereby certify that I have performed a review of the case that is reasonable under the circumstances and I have a good faith belief that an appeal is warranted[,]" I could not under the circumstances file an appeal.

While Ms. Sturm also stated that Mr. Greynolds "could have contacted the Circuit Judge and requested a new attorney be appointed to represent him on his appeal[,]" she said nothing about her trying to withdraw from the case.

13

## C. Hearing Panel Subcommittee Proceedings

On May 4, 2014, the HPS heard testimony from Ms. Wright-Ochoa, Mr. Brown, Mr. Greynolds and Ms. Sturm. As a result of the testimony and the exhibits received, the HPS determined that in the Brown/Wright-Ochoa case, Ms. Sturm had violated Rule 1.1[9] and Rule 1.3[10] of the West Virginia Rules of Professional Conduct because "she neglected Mr. Brown's case and failed to timely file a Petition for *Habeas Corpus* for Mr. Brown." The HPS also found that Ms. Sturm violated Rule 1.4,[11] due to Ms. Sturm's failure to respond to Mr. Brown's requests for information and her failure "to explain the matter" to him. Further, Ms. Sturm was found to have violated Rule 1.8,[12] because she "failed to seek Mr.

---

[9]Rule 1.1 of the West Virginia Rules of Professional Conduct provided: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

[10]Rule 1.3 of the West Virginia Rules of Professional Conduct provided that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

[11]Rule 1.4 of the West Virginia Rules of Professional Conduct provided that "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information[,]" and "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

[12]Rule 1.8 of the West Virginia Rules of Professional Conduct provided, in relevant part:

> (f) A lawyer shall not accept compensation for representing a client from one other than the client unless:

(continued...)

14

Brown's consent after consultation to accept compensation from Ms. Wright-Ochoa for Mr. Brown's case and failed to prevent any interference with her independence of professional judgment and the attorney client relationship[.]" The HPS also found that Ms. Sturm violated Rule 1.14,[13] as Ms. Sturm "failed to reasonably maintain a normal client-attorney relationship with Mr. Brown when she understood that he had an impairment[.]" The HPS found that "[b]ecause . . . [Ms. Sturm] failed to properly deposit all of the retainer fee with

---

[12](...continued)
        (1) the client consents after consultation;
        (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
        (3) information relating to representation of a client is protected as required by Rule 1.6.

[13]Rule 1.14(a) of the West Virginia Rules of Professional Conduct provided that "[w]hen a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client."

the client's trust account, she . . . violated Rule[] 1.15[14]. . . ."   Additionally, the HPS found

that Ms. Sturm violated Rule 1.16(d)[15] as follows:

> [Ms. Sturm]. . . provided evidence that she worked on and completed a draft version of Mr. Brown's *habeas* petition. However, it is uncontested that the petition was never finalized, much less filed on his behalf.  The Hearing Panel therefore concludes that . . . [Ms. Sturm] was compensated for what it determines was an unearned fee. . . .  [Ms. Sturm also] failed to provide a refund of the unearned Five Thousand Dollars ($5,000.00) which was likewise not supported by contemporaneous time records pursuant to the fee agreement[.]

---

[14]West Virginia Rule of Professional Conduct 1.15(a) provided:

> (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.  Funds shall be kept in a separate account designated as a "client trust account" in an institution whose accounts are federally insured and maintained in the state where the lawyer's office is situated, or in a separate account elsewhere with the consent of the client or third person.  Other property shall be identified as such and appropriately safe guarded.  Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

[15]West Virginia Rule of Professional Conduct 1.16(d) provided, in relevant part, that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . refunding any advance payment of fee that has not been earned. . . ."

16

Finally, the HPS determined that Ms. Sturm violated Rules 3.2,[16] 8.1[17] and 8.4,[18] based upon its respective findings as to each rule as follows:  1)  she "failed to make reasonable efforts consistent with the stated and agreed upon objectives of her client, Mr. Brown, prior to his release[;]"  2)  she "failed to timely comply" with the ODC's requests for information; and 3) she "failed to file the Petition for *Habeas Corpus* for Mr. Brown, prior to his release[.][19]" (Footnote added).

Regarding Mr. Greynolds' complaint, the HPS found that Ms. Sturm violated West Virginia Rule of Professional Conduct 1.3[20] by failing to file an appeal for Mr. Greynolds after being appointed by the Court to do so.  The HPS also found a violation of

---

[16]West Virginia Rule of Professional Conduct 3.2 provided that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the client."

[17]West Virginia Rule of Professional Conduct 8.1 provided, in relevant part, that "a lawyer in connection with . . . a disciplinary matter, shall not: . . . knowingly fail to respond to a lawful demand for information from . . . [the] disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6."

[18]West Virginia Rule of Professional Conduct 8.4 provided, in relevant part, that "[i]t is professional misconduct for a lawyer to: . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation[, and] [e]ngage in conduct that is prejudicial to the administration of justice."

[19]Except for the violations found by the HPS of Rules 1.1 and 1.16 in the Brown/Wright-Ochoa case, Ms. Sturm admitted to every other rule violation in her stipulations.

[20]*See supra* n.10.

Rule 1.4(a)[21] due to Ms. Sturm's failure to respond to Mr. Greynolds' request for information and status about his appeal. Finally, the HPS found that the Respondent violated Rule 8.4(d),[22] because she

> failed to timely withdraw, or attempt to withdraw, from representation while believing she had no grounds to appeal, this arguably resulted in a failure for anyone, including . . . [Mr. Greynolds], to file an appeal. Regardless of the merits[23] of this appeal this arguably negatively impacted Mr. Greynolds' rights. Since she remained . . . [his] appointed counsel . . . [Ms. Sturm] furthermore failed to perfect his appeal, regardless of its merits, in a timely manner.

(Footnote omitted and footnote added).

Based upon the foregoing findings of misconduct, the HPS presented the following recommended sanctions to the Court for its consideration in the Brown/Wright-Ochoa case:

> a.   That . . . [Ms. Sturm] shall be reprimanded;
> [b].  That . . . [Ms. Sturm's] practice shall be supervised for a period of two (2) years by an attorney agreed upon between the Office of Disciplinary Counsel and . . . [Ms. Sturm], which shall run concurrent to the supervised

---

[21]*See supra* n.11.

[22]*See supra* n.18.

[23]We make no determination regarding the merits of any appeal that may have been taken on Mr. Greynolds' behalf as the only issue before us involves his attorney's professional conduct.

18

> practice under Case No. 15-0009 [24] [the Greynolds case].
> . . . [Ms. Sturm] shall meet with her supervising attorney
> every two (2) weeks. The goal of the supervised practice
> will be to improve the quality and effectiveness of . . .
> [Ms. Sturm's] law practice to the extend that . . . [her]
> sanctioned behavior is not likely to recur;
>
> [c]. That . . . [Ms. Sturm] shall refund the Five Thousand
> Dollars ($5,000.00) retainer fee to Ms. Wright[-]Ochoa;
> and
>
> [d]. That, pursuant to Rule 3.15 of the Rules of Lawyer
> Disciplinary Procedure, . . . [Ms. Sturm] shall pay costs
> of this disciplinary proceeding.

(Footnote omitted). Further, in the Greynolds case, the HPS recommended that Ms. Sturm

be reprimanded and required to pay the costs of the disciplinary proceeding as sanctions for

the violations found in that case.

The ODC consented to the forgoing sanctions recommended by the HPS.

Likewise, Ms. Sturm did not file any objections to the HPS's reports, inclusive of the

foregoing recommended sanctions. This Court, however, did not concur with the

recommended sanctions and the case was set for oral argument.

## II. STANDARD OF REVIEW

In lawyer disciplinary proceedings, we apply the following standard of review:

---

[24]In its brief, LDB notes that the recommendation that supervised practice run concurrent with supervised practice in the Greynolds case was in error as there was no recommended sanction for supervised practice in the Greynolds case.

"A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. Pt. 3, *Comm. on Legal Ethics of the West Virginia State Bar v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

Syl. Pt. 1, *Lawyer Disciplinary Bd. v. Conner*, 234 W. Va. 648, 769 S.E.2d 25 (2015).

While we respectfully consider the HPS's recommendations, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics of the W. Va. State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984). With this standard of review in mind, we proceed with an examination of sanctions recommended for imposition in this case.

## III. DISCUSSION

The sole issue before the Court is a determination of the appropriate sanctions to impose upon Ms. Sturm for her professional misconduct. The HPS recommended only that we reprimand her in both cases, as well as impose several other lesser sanctions. Both the ODC and Ms. Sturm advocate that this Court adopt the HPS's recommended sanctions in each case.

20

In syllabus point four of *Office of Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998), this Court held

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

We, however, also held in syllabus point five of *Jordan* that "[a]lthough Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates the factors to be considered in imposing sanctions after a finding of lawyer misconduct, a decision on discipline is in all cases ultimately one for the West Virginia Supreme Court of Appeals. . . ." 204 W. Va. at 496, 513 S.E.2d at 723, Syl. Pt. 5, in part.

After a thorough review of the record in this case, this Court, in focusing upon all four of the *Jordan* factors, finds none to weigh in Ms. Sturm's favor. Our examination is prefaced with the recognition that "attorney disciplinary proceedings are primarily designed to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice[.]" *Comm. on Legal Ethics of the W. Va. State Bar v. Keenan*, 192 W. Va. 90, 94, 450 S.E.2d 787, 791 (1994).

21

As to the first *Jordan* factor, Ms. Sturm violated multiple duties owed to her clients she represented in these cases, including the duties of candor, loyalty, diligence and honesty. During the pendency of both matters, Ms. Sturm failed to file a petition for habeas corpus that she was retained to file and she never filed an appeal in a criminal case that she was court-appointed to file.[25] She also failed to communicate with her clients in any

[25]Ms. Sturm should have filed an *Anders* brief in the Greynolds case given that she thought there were no meritorious grounds to appeal. *See* Syl. Pt. 3, *State v. McGill*, 230 W. Va. 85, 88 n.7, 736 S.E.2d 85, 88 n.7 (2012) (holding that "[p]ursuant to principles contained in Rule 3.1 of West Virginia Rules of Professional Conduct, an appellate remedy should not be pursued unless counsel believes in good faith that error has been committed and there is a reasonable basis for the extension, modification, or reversal of existing law[,]" but "acknowledg[ing] that good faith may at times be defined by the legal obligation of counsel to file a brief referring to any point in the record that might arguably support the appeal in instances where a criminal defendant insists upon appeal after being advised that the case is wholly frivolous. *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *see also Turner v. Haynes*, 162 W.Va. 33, 245 S.E.2d 629 (1978), *Rhodes v. Leverette*, 160 W.Va. 781, 239 S.E.2d 136 (1977).").

Although the filing of an *Anders* brief has been recognized and utilized for years, this Court recently amended Rule 10(c)(10) of the West Virginia Rules of Appellate Procedure, effective January 1, 2016, to now provide, in relevant part, the following procedure for attorneys to follow when faced with the situation presented to Ms. Sturm:

The following requirements must be observed when counsel in a criminal, habeas corpus, or abuse and neglect case is directed by a client to file an appeal where counsel lacks a good faith belief that an appeal is reasonable and warranted under the circumstances:

(a) Counsel must engage in a candid discussion with the client regarding the merits of the appeal. If, after consultation with the client, the client insists on proceeding with the appeal, counsel must file a notice of appeal and perfect the appeal on the petitioner's behalf. The petitioner's brief should raise any

(continued...)

22

meaningful way about their cases and the work she was supposed to perform for them. In fact, Ms. Sturm never directly spoke with either Mr. Brown or Mr. Greynolds. While Ms. Sturm did communicate with Ms. Wright-Ochoa regarding Mr. Brown's case, the record is clear that she never obtained permission from Mr. Brown to accept compensation from his mother. Ms. Sturm also allowed Mr. Brown's mother to control and make decisions in the case, rather than relying upon any instructions from her client, Mr. Brown. Additionally, Ms. Sturm failed to keep contemporaneous time records in Mr. Brown's case insofar as she failed to record specific dates, times or tasks that she had worked on in the matter. Further, she failed to place client funds in her client trust account, failed to promptly refund client funds, and failed to respond to requests from the ODC. Finally, Ms. Sturm failed to comply

---

[25](...continued)

> arguable points of error advanced by the client. Counsel need not espouse unsupportable contentions insisted on by the client, but should present a brief containing appropriate citations to the appendix and any case law that supports the assignments of error.
>
> (b) In extraordinary circumstances, if counsel is ethically compelled to disassociate from the contentions presented in the brief, counsel must preface the brief with a statement that the brief is filed pursuant to Rule 10(c)(10)(b). Counsel should not inject disclaimers or argue against the client's interests. If counsel is ethically compelled to disassociate from any assignments of error that the client wishes to raise on appeal, counsel must file a motion requesting leave for the client to file a pro se supplemental brief raising those assignments of error that the client wishes to raise but that counsel does not have a good faith belief are reasonable and warranted.

with the scheduling order entered by this Court, by filing her brief with a motion out of time.[26] Ms. Sturm's conduct most certainly impugned the integrity of legal profession and the administration of justice. *See Conner*, 234 W. Va. at 656, 769 S.E.2d at 33 (stating that "Ms. Conner's conduct brought disrepute upon the legal system and profession.").

The second factor calls upon us to consider whether Ms. Sturm's conduct was intentional, knowing or negligent. The HPS found that Ms. Sturm acted negligently. The HPS noted in both cases that "the ABA Standards for Imposing Lawyer Sanctions define negligence as the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in that situation." The evidence in this case proves that, at a minimum, Ms. Sturm acted negligently in her representation of these two clients.

The third factor requires us to consider the actual or potential harm caused by Ms. Sturm's misconduct. Ms. Sturm testified that in the Brown/Wright-Ochoa case she believed and still believes that there were viable grounds upon which to file a petition for habeas corpus relief. As a result of her inaction in failing to file the habeas petition, the HPS determined that

---

[26]Further, Ms. Sturm's motion to file her brief out of time failed to comply with West Virginia Rules of Appellate Procedure 37, 38, and 39.

Mr. Brown suffered an actual injury in his continued incarceration without his Petition for Habeas Corpus being filed and he had to end up filing his own pro se Petition. Mr. Brown was subsequently released for serving his time, but it was over a two and a half years from the time . . . [Ms. Sturm] was first hired to file the Petition. . . .

The HPS also found that Mr. Greynolds suffered an injury as well. Specifically, the HPS stated that Mr. Greynolds "did suffer an injury when his appointed counsel failed to either withdraw, attempt to withdraw or file an *Anders* Brief on his behalf." As the HPS found, while Mr. Greynolds' "odds of appellate success may have been slim, he will never know with certainty whether he would have success[,]" because his attorney did nothing. We agree with the HPS's finding that the evidence supports the conclusion that injuries were sustained by both Mr. Brown and Mr. Greynolds due to Ms. Sturm's unprofessional conduct.

We finally examine the presence of both aggravating and mitigating factors in these two cases in ascertaining the proper sanction to be imposed. As we held in syllabus point two of *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003), "[m]itigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." We further held in syllabus point three of *Scott* that

[m]itigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems;

25

(4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

*Id.* at 210, 579 S.E.2d at 551, Syl. Pt. 3. Conversely, "[a]ggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." *Id.*, Syl. Pt. 4.

As for mitigating factors, the HPS found the presence of a cooperative attitude toward the proceedings and remorse in both cases. In the Brown/Wright-Ochoa case, the HPS also found "no dishonesty or selfish motive" and "no prior adverse disciplinary findings, although contemporaneous with this hearing she was also subject to a . . . [complaint in the Greynolds case]." The HPS further found in the Brown/Wright-Ochoa case the fact Ms. Sturm had modified her billing and practice methods to be mitigating. Finally, the HPS noted in both cases that she had been under duress at the time of this matter due to "significant personal events outside her control." The HPS further noted in the Brown/Wright-Ochoa case that while those events were not the fault of Mr. Brown or Ms. Wright-Ochoa, her clients, "they provide[d] a reasonable explanation for some of . . . [Ms. Sturm's] communication lapses."

As aggravating factors in both cases, the HPS found the presence of Ms. Sturm's experience in the practice of law and her prior disciplinary action by the Investigative Panel of the LDB.[27]

Taking into account all the mitigating and aggravating factors, we are confounded as to why the HPS found the lack of prior "adverse" disciplinary findings as a mitigating factor while also finding the presence of two prior Investigative Panel admonishments to be an aggravating factor. As the HPS found, and the LDB advocates, it should be considered mitigating that Ms. Sturm was only admonished in the two prior disciplinary actions brought against her. The HPS notes in the Brown/Wright-Ochoa case that Ms. Sturm "had no prior adverse disciplinary findings," despite also recognizing the prior disciplinary action by the Investigative Panel of the LDB. We are equally disturbed that

---

[27]The first Investigative Panel admonishment was on February 8, 2013, and was for violating Rule 1.1 (regarding competence); Rule 1.3 (regarding diligence) and Rule 1.5(c) (requiring contingent fee agreements be in writing) of the West Virginia Rules of Professional Conduct. Ms Sturm is currently charged with violations of Rule 1.1 and Rule 1.3.

The second Investigative Panel admonishment was on October 31, 2013, and was for violating Rule 3.4(c) (concerning disobeying an obligation under the rules of a tribunal) and Rule 8.4(d) (pertaining to conduct that is prejudicial to administration of justice) of the West Virginia Rules of Professional Conduct. Specifically regarding this admonishment, similar to the Greynolds case, Ms. Sturm was appointed to pursue an appeal on behalf of a party in an abuse and neglect matter. Ms. Sturm filed the proper notice of appeal and then failed to perfect the appeal, resulting in the matter being dismissed. Further, Ms. Sturm failed to respond to numerous phone calls made by the Clerk of the West Virginia Supreme Court to her. Again, Ms. Sturm claimed that there was no meritorious grounds for an appeal, yet she failed to advise the Court in any way.

27

the LDB engaged in a game of semantics in its argument before the Court that Ms. Sturm "had no prior disciplinary proceedings before this Honorable Court," in an attempt to mitigate Ms. Sturm's prior admonishments by the Investigative Panel for conduct very similar to the conduct at issue now. The manner in which these conflicting positions espoused by the HPS and the LDB as the mitigating and aggravating factors were analyzed is confusing at best. There is nothing in our rules or case law supportive of the proposition that if the discipline is only an admonishment given by the Investigative Panel of the LDB, and not this Court, it is not to be considered as aggravating. Rather, we have treated an Investigative Panel admonishment to be aggravating just like any other disciplinary action. *See Lawyer Disciplinary Bd. v. Grindo*, 231 W. Va. 365, 371, 745 S.E.2d 256, 262 (2013) ("This Court finds in light of Mr. Grindo's past history of being admonished by the Investigative Panel of the LDB, there is case law that supports a 30-day suspension of Mr. Grindo's license. *See e.g. Lawyer Disciplinary Board v. Sullivan*, 230 W. Va. 460, 740 S.E.2d 55 (2013).").

Notwithstanding Ms. Sturm's conduct in the cases sub judice, Ms. Sturm's prior conduct establishes her propensity for ignoring requests from the ODC and this Court for information, as well as her pattern and practice of failing to file pleadings or appeals with courts and failing to communicate with her clients. Our concern with Ms. Sturm's conduct in these two cases is heightened by her testimony that she has ninety to one hundred clients

28

and handles a lot of court-appointed cases. Some of these individuals are in great need of competent legal services, and it may take more effort and diligence to meet with them in order to assure that their legal matters are being handled in a competent manner. While we understand that sometimes a lawyer's personal problems require the lawyer's utmost attention, this focus of a lawyer's attention cannot come at the client's expense. Rather, we are extremely concerned about the repetitive nature of Ms. Sturm's conduct regardless of her personal problems. Ms. Sturm's two prior admonishments failed to prevent her from repeating similar conduct.

Consequently, we find the recommended sanction of reprimand for both cases to be too lenient given the repetitive nature of Ms. Sturm's misconduct. Ms. Sturm's conduct is similar to that displayed by the attorneys in *Conner* and *Lawyer Disciplinary Board v. Hollandsworth*, No. 14-0022 (W. Va. Sept. 18, 2014 ) (unreported order).[28] Like the instant case, in *Conner*, the Court was presented with an attorney who had, in relevant part, failed: 1) to appeal or take action in cases, including a criminal appeal; 2) to communicate with her clients; 3) to appear before this Court as ordered; 4) to return an unearned fee; and 4) to

[28]The LDB attempts to distinguish *Conner* and *Hollandsworth* due to the HPS in the instant matter finding that Ms. Sturm's conduct was negligent instead of intentional, that "there is no evidence . . . [Ms. Sturm] failed to abide by a court Order," and that several mitigating factors are present in this case, which were not present in either *Connor* or *Hollandsworth*. We find the LDB's argument unpersuasive.

comply with ODC's requests for information. *See* 234 W. Va. at 27-29, 769 S.E.2d at 650-52. As a result of the ethical violations in *Conner*, the HPS further found:

> the remorse shown by Ms. Conner during the disciplinary proceedings constituted a mitigating factor. Conversely, several aggravating factors also were present. Ms. Conner's propensity to ignore requests from the ODC and this Court, Ms. Conner's substantial experience in the practice of law, Ms. Conner's exhibition of a pattern and practice of misconduct by failing to communicate with her clients and failing to diligently pursue cases on behalf of her clients, and Ms. Conner's prior disciplinary proceedings constituted aggravating factors.

*Id.* at 34, 769 S.E.2d at 657. The HPS recommended as a sanction a thirty-day suspension from the practice of law, in addition to requiring a refund of a retainer fee, imposing a two-year period of supervisory practice, and requiring reimbursement to the LDB the costs of the proceeding. *Id.* at 654, 769 S.E.2d at 31. This Court found that Ms. Connor's conduct warranted more than a thirty-day suspension and increased the length of her suspension to ninety days. *Id.* at 658, 769 S.E.2d at 35.

Likewise, in *Lawyer Disciplinary Board v. Richard W. Hollandsworth*, No. 14-0022 (W. Va. Sept. 18, 2014) (unreported order), Mr. Hollandsworth was suspended for ninety days after being appointed to represent a client in a habeas matter and failing to contact his client, even after being ordered to do so. The client sought to have new counsel appointed and when the circuit court failed to do so, the client filed a writ of mandamus with this Court. We granted the writ, directed the circuit court to appoint new counsel and

directed the Clerk of this Court to refer Mr. Hollandsworth to the ODC for his "lack of diligence" in the case. In *Hollandsworth*, the HPS found many of the same professional conduct violations that are present in the instant case. Specifically, the HPS found that Mr. Hollandsworth "failed to pursue" his client's petition for habeas corpus, failed to communicate with his client, failed to keep his client informed about the status of his case, and "failed in his responsibility as a court appointed attorney to represent his client diligently[.]"

Consequently, based on all the foregoing, we find that a ninety-day suspension from the practice of law is an appropriate sanction. In determining the appropriate sanction for Ms. Sturm, we are guided by the principles set forth in syllabus point seven of *Jordan*:

> "'In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.' Syllabus Point 3, *Committee on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987)." Syl. Pt. 5, *Committee on Legal Ethics v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989).

204 W. Va. at 497, 513 S.E.2d at 724, Syl. Pt. 7. The totality of Ms. Sturm's conduct warrants more than a reprimand, especially in the light of the ineffectiveness of the two admonishments that she already has received in other cases with similar conduct. Therefore,

31

we impose a ninety-day suspension from the practice of law and adopt the remaining recommendations made to this Court by the HPS.

## IV.  CONCLUSION

For the foregoing reasons, we impose the following sanctions:  1) that Ms. Sturm's law license be suspended for a period of ninety days pursuant to Rule 3.15 of the West Virginia Rules of Lawyer Disciplinary Procedure;[29] that following Ms. Sturm's suspension, her practice be supervised for a period of two years by an attorney agreed upon between the ODC and Ms. Sturm; that Ms. Sturm meet with her supervising attorney every two weeks with the goal of the supervised practice being to improve the quality and effectiveness of her law practice to the extent that her sanctioned behavior is not likely to recur; that Ms. Sturm refund the $5,000 retainer fee to Ms. Wright-Ochoa immediately; and that prior to being automatically reinstated, pursuant to Rule 3.15, Ms. Sturm pay the costs of the disciplinary proceeding in the Wright-Ochoa/Brown case and the Greynolds case.

Law License Suspended and Other Sanctions.

---

[29]As Ms. Sturm's suspension will be for "a period of three months," she is subject to being automatically reinstated pursuant to the provisions of Rule 3.31 of the West Virginia Rules of Disciplinary Procedure.