798 S.E.2d 871

**LAWYER DISCIPLINARY BOARD, Petitioner**

v.

**Lauren THOMPSON, a Member of the West Virginia State Bar, Respondent**

No. 16–0003

Supreme Court of Appeals of West Virginia.

Submitted: March 7, 2017

Filed: April 10, 2017

---

Rachael L. Fletcher Cipoletti, Chief Lawyer Disciplinary Counsel, Office of Disciplinary Counsel, Charleston, West Virginia, Attorney for the Petitioner

W. Thomas Ward, Ward, & Associates, PLLC, Jane Moran, Jane Moran Law Office, Williamson, West Virginia, Attorneys for the Respondent

Davis, Justice:

The issue before us arises out of Lauren Thompson's ("Ms. Thompson") acts and failures to act in her capacity as a court-appointed guardian ad litem representing the interests of an infant. The conduct includes the disregard of orders of this Court commanding the filing of appellate briefs or summary responses in the setting of appeals brought by parents who had their parental rights terminated at the circuit court level.

The West Virginia State Bar Lawyer Disciplinary Board instituted formal disciplinary charges against Ms. Thompson on January 6, 2016, with the filing of a Statement of Charges. Following discovery and a hearing, the Hearing Panel Subcommittee ("HPS") of the Lawyer Disciplinary Board found violations of the West Virginia Rules of Professional Conduct ("the Rules of Professional Conduct") and has recommended that Ms. Thompson be suspended for a period of three months, required to petition for reinstatement, and attend an additional twelve hours of continuing legal education in the area of abuse and neglect and/or law office management, in addition to other recommended sanctions.

Ms. Thompson objects to the recommended suspension. She contends the appropriate sanction for her violation of the Rules is a public reprimand. Alternatively, she requests that this Court adopt the recommendation of the HPS of suspension from the practice of law for three months; but, she seeks credit for the time she has been prohibited from serving as appointed counsel in criminal and abuse and neglect matters during the pendency of the disciplinary process.

The Office of Disciplinary Counsel ("ODC") disagrees with the recommendation as to sanctions. Specifically, the ODC contends that the length of the proposed three month sanction is inadequate given the circumstances, which include malfeasance and intentional contempt.

We have undertaken a thorough review of the record submitted, the briefs, and the arguments of the ODC and Ms. Thompson, as well as the applicable legal precedent. This Court has carefully considered the report and recommendations of the HPS. Upon our review of both aggravating and mitigating factors, as well as considering the high priority nature of abuse and neglect cases and the tender years of a vulnerable infant child who lacked a voice, this Court adopts the three month suspension from the practice of law recommended by the HPS, together with the recommendation of the completion of additional continuing legal education. This Court concludes that automatic reinstatement after suspension of three months pursuant to Rule 3.31 of the Rules of Lawyer Disciplinary Procedure is appropriate, and

we further require Ms. Thompson to pay the costs of these disciplinary proceedings.

## I.

### FACTUAL AND PROCEDURAL HISTORY

#### A. Conduct Leading to Allegations of Misconduct

As we proceed to set out the factual and procedural history of this matter, we observe that the ODC and Ms. Thompson commendably worked cooperatively to enter into extensive stipulations of fact concerning the circumstances surrounding this disciplinary matter. Those stipulated facts were adopted in nearly verbatim form by the HPS in its Report. At the hearing, additional facts were elicited, and findings were made by the HPS. The ODC has advised that it has found no errors in the findings of fact made by the HPS. Ms. Thompson has not asserted any error in the findings of fact. The factual history we provide is drawn from the stipulations, the facts set forth by the HPS, and pertinent testimony elicited at the hearing before the HPS.

At all relevant times, Ms. Thompson was a lawyer practicing in Williamson, Mingo County, West Virginia. Upon passage of the bar examination, Ms. Thompson was admitted to the West Virginia State Bar on October 20, 2009. As such, Ms. Thompson is subject to the disciplinary jurisdiction of the Supreme Court of Appeals of West Virginia and its properly constituted Lawyer Disciplinary Board.

Upon admission to the practice of law, Ms. Thompson opened a solo practice in Williamson, West Virginia. Her practice consisted of personal injury litigation, appointments by the court to represent indigent criminal defendants, and appointments in child abuse and neglect cases initiated by the Child Protective Services Division ("CPS") of the West Virginia Department of Health and Human Resources ("DHHR") wherein CPS sought temporary or permanent custody of children due to allegations of abuse or neglect.

In 2013, Ms. Thompson was appointed guardian ad litem of a four-month-old infant who was the subject of CPS proceedings. Ms. Thompson represented the child as guardian ad litem throughout the course of the abuse and neglect proceedings. On or about February 9, 2015, the Circuit Court of Mingo County, the Honorable John Cummings, Senior Status Judge, presiding, entered an order terminating the parental, custodial, and guardianship rights of the child's biological mother and father. Ms. Thompson represented to Judge Cummings that, upon her independent investigation, she agreed with the position of CPS and recommended that the parental rights be terminated.

Both the mother and father filed notices of intent to appeal with this Court. Initially, we issued separate scheduling orders for each parent's appeal. Subsequently, this Court issued an order directing the filing of a joint appendix and further ordering the filing of briefs or summary responses by Ms. Thompson as guardian ad litem on or before May 20, 2015.

Ms. Thompson failed to file a brief or summary response on or before May 20, 2015. On May 22, 2015, a staff member of the West Virginia Supreme Court Clerk's Office ("Clerk's Office") telephoned Ms. Thompson's law office and left a message with an office assistant advising that the briefs in the pending appeals were past due. Thereafter, no responsive briefs were filed by Ms. Thompson.

By Order entered May 27, 2015, this Court issued Notices of Intent to Sanction and Amended Scheduling Orders in the appeals of both the father and the mother. The Order directed Ms. Thompson to file briefs or summary responses on or before June 1, 2015. She was reminded that failure to comply could result in the imposition of sanctions. The Notices and Orders were issued through certified mail.

Again, Ms. Thompson failed to file a brief or summary response as required of guardians ad litem and as ordered by this Court. On or about Friday, June 5, 2015, a staff attorney in the Clerk's Office sent Ms. Thompson an e-mail advising her that the Court had issued Notices of Intent to Sanction. Copies of the Notices were included as

attachments to the e-mail. The staff attorney requested that Ms. Thompson file her responses as soon as possible. On Monday, June 8, 2015, Ms. Thompson e-mailed the staff attorney stating, in pertinent part, "I have no idea what is going on.... I was unaware of any of this. I will figure out what has happened today."

Thereafter, the staff attorney replied to Ms. Thompson advising her that the responses could be submitted by fax to the Clerk's Office together with a motion to file the responses out of time. The staff attorney attached a signed confirmation demonstrating that Ms. Thompson's law office had received the Notices and Orders of May 27, 2015.

We note that Ms. Thompson testified before the HPS that she was unaware of the pending appeals until she received the e-mail on June 8, 2015. Specifically, Ms. Thompson testified to a lack of staff and staff failures at her office that resulted in her lack of knowledge of the appeals. Ms. Thompson did recognize her ultimate responsibility for any problems and challenges with her staff.

Still having received no briefs or summary responses from Ms. Thompson, this Court, on its own motion, entered Orders on June 11, 2015, wherein rules to show cause in contempt were awarded and issued against Ms. Thompson in both appeals for her failure to timely file the response briefs. The rules to show cause why she should not be held in contempt of court were returnable on September 2, 2015, unless sooner mooted by the filing of briefs. Ms. Thompson personally signed the return receipt confirmation on June 17, 2015, indicating she received the Orders of June 11, 2015. Nevertheless, Ms. Thompson continued in her failure to represent the infant and failed to file any responses.

The staff attorney testified before the HPS that the efforts of the Court and the Clerk's Office were directed at obtaining the responses so that the appeals could be fully considered and timely decided prior to the end of the term in June 2015. That did not occur. Thereafter, in a continuing effort to obtain the briefs or summary responses, so that the appeals could be decided as soon as possible upon the beginning of the September 2015 term of Court, staff in the Clerk's Office called, contacted, and/or attempted to contact Ms. Thompson about the filing of responses on July 5, 2015; July 23, 2015; August 7, 2015; and August 14, 2015. On each occasion, Ms. Thompson was unavailable to take the calls. Further, Ms. Thompson did not return any of the phone calls or contacts from the Clerk's Office.

As indicated above, Ms. Thompson initially attributed her failure to file the responsive briefs or summaries to her lack of knowledge of the appeals and their corresponding deadlines. However, she testified at the HPS hearing that, at some point, she decided not to file responses so she could appear before the Court and present her concerns and frustrations with perceived failures on the part of DHHR in Mingo County.

Indeed, at a judicial review hearing to consider the case of the infant, before Judge Cummings in Mingo County on August 14, 2015, the following colloquy took place:

The Court: First let me ask what is the status of the appeal?

Ms. Thompson: The Guardian ad litem has yet to answer.

The Court: And who is the Guardian ad litem?

Ms. Thompson: That would be me. Judge, as I've probably mentioned before, I'm *agitated on other issues*. They've invited me to come up and speak to the Supreme Court, which I'm tempted to—

The Court: They've invited you or told you to?

Ms. Thompson: If it's not done by a certain date, then I can come on up. I don't know—It's like *this case isn't impacted by the reason I'm dragging my feet*. I should probably just submit it, but, it's like you know, I've had—last week I had a child that should have had her college paid for not get Chafee Funds because the Department won't do their job and it's like—

The Court: Well, let me state this. File something with them. I cannot take any action on this.

Ms. Thompson: I know, sir, and no one else is willing to.

The Court: And no one else can until that matter. I can take the action of retaining—keeping things as status quo, which I must unless there is some adverse report. But get that filed because they will sanction you.

(Emphasis added).

Ms. Thompson proceeded to indicate she did not think she would be sanctioned and that this Court needed to talk to her. Judge Cummings told her that if she did not get a response filed, he, too, would sanction her. He then essentially apologized to the foster parents of the child for the delay and the fact that he could not proceed on permanency until the appeals of the biological parents were concluded. We observe that one of the foster parents testified before the HPS that Ms. Thompson informed him that the reason she had not filed the responses was that she was trying to make a point in another case.

Before the HPS, Judge Cummings testified that he advised Ms. Thompson, on at least one other occasion, to file responses with this Court. Judge Cummings informed Ms. Thompson that there was a right way and a wrong way to get her perceived issues before the Court and clearly instructed her that failing to respond was the wrong way. He also advised Ms. Thompson that there were other mechanisms to handle her concerns, such as working through DHHR, taking action with the local prosecutor, or by instituting extraordinary writ proceedings before this Court.

Nevertheless, despite the efforts of the Clerk's Office and the direction of Judge Cummings, Ms. Thompson persisted in refusing to file the briefs. On August 31, 2015, staff in the Clerk's Office again attempted to contact Ms. Thompson about filing the briefs in the appeals. Ms. Thompson's assistant represented that responses would be filed "before tomorrow." Finally, on September 1, 2015, the day before oral argument on the rules to show cause, Ms. Thompson filed a motion to submit her briefs out of time and submitted briefs in both pending appeals. Ms. Thompson indicated that the responses were late due to staffing issues and calendaring errors. She asserted that the child was awaiting adoption by the foster parents, and, therefore, no party was prejudiced by her failure to file the briefs in the abuse and neglect proceedings. In the briefs, Ms. Thompson did not identify any concerns or issues with CPS or DHHR activities in Mingo County.

On September 3, 2015, this Court, on its own motion, entered an Order finding that the justification provided by Ms. Thompson for the untimely filing of the briefs was "unsatisfactory given the need for these abuse and neglect cases to be considered as expeditiously as possible in order to ensure the timely permanency for the minor child involved...." This Court issued a second rule to show cause against Ms. Thompson directing her to appear on September 16, 2015, to show cause why she should not be held in contempt, denied eligibility for future guardian appointments, and subjected to further sanctions due to the untimely filings. She was ordered to file a written response by September 9, 2015. The Order provided that the written response did not negate Ms. Thompson's obligation to appear before this Court.

A faxed copy of Ms. Thompson's Response to the Order to Show Cause was received in the Clerk's Office at 8:45p.m. on September 9, 2015. For the first time, Ms. Thompson represented the reason for the late filing of the briefs was to place her concerns about the actions and inactions of Mingo County DHHR, which made it difficult to act in the best interest of children, before an alternate court. Ms. Thompson indicated that the responsibilities of guardians ad litem are difficult enough without the necessity of dealing with appeals filed on behalf of "disinterested parties." She stated that she believed "filers" should be required to show that the petitioners are "active, willing participants in their appeal." In confusing fashion that appeared to suggest her failures in filing were excused by a lack of active participation by the petitioner parents, Ms. Thompson argued that

[t]alented attorneys can always make interesting arguments on behalf of their respective clients but if any portion was reversed and remanded I have serious concerns as to what would happen next

and how long those types of matters would persist. These parents have not presented themselves at any time since the last months of the case and I suspect that was only because they were jailed. What would be the next step? Would the State be forced to retry the entire case but this time allege abandonment? It is not realistic and does not make economic sense to allow the filing of appeals on behalf of disinterested parties. Requiring a party to acknowledge their participation and acquiescence by the simple filing of a verification or the checking and signing of a box would resolve a great deal of unnecessary expenditures, delays in finalization, and work.

Ms. Thompson represented that the child was safe, well-cared for, and loved in a pre-adoptive foster home. Additionally, Ms. Thompson submitted an affidavit outlining her concerns, anger, and frustration about DHHR. None of the identified concerns were related to the case of the child she was representing in the subject appeals to this Court.

Oral argument was held on the Rule to Show Cause on September 16, 2015. On September 17, 2015, Ms. Thompson sent a letter to this Court in which she reiterated her stated justification for failing to file briefs. Ms. Thompson stated that it was not until after oral argument that she realized how this Court viewed her conduct in failing to timely file the briefs. Specifically, Ms. Thompson wrote:

> At no time until yesterday morning did it occur to me that the events which led up to my appearance could create the impression that I was failing to do my homework and making excuses for it. It is amazing the damage one's sense of moral indignation can cause because as I left the building I could see nothing other than my missteps.
>
> . . . .
>
> In retrospect, it was just a missed deadline which *could possibly* have been quickly cured. But at the time, in my mind it became an inevitability and the only opportunity I would have to talk about very serious problems that were occurring.

She also indicated that she meant no disrespect to the Court or staff and had just dug her heels in on not responding. Ms. Thompson stated: "Once I realized how things had been interpreted, it became an out of body experience."

Ms. Thompson's response briefs as guardian ad litem were ordered filed in both appeals, thereby making the cases ripe for decision. On September 30, 2015, this Court entered Memorandum Decisions affirming the Mingo County Circuit Court's Order terminating the parental, custodial, and guardianship rights of the child's parents.

Additionally, on September 30, 2015, this Court issued a Memorandum Decision in regard to the rules to show cause against Ms. Thompson. *See In Re: A.N.*, Nos. 15–0182 & 15–0208, 2015 WL 5738019 (W. Va. Sept. 30, 2015) (memorandum decision). This Court held Ms. Thompson in contempt and ordered that she was denied eligibility for guardian ad litem and other court appointments until such time as the ODC investigated and any resulting disciplinary proceedings were concluded. *Id.* at *3. We reiterated the critical role of guardians ad litem in all stages of abuse and neglect proceedings. The Court observed the troubling lack of concern Ms. Thompson displayed for the individual infant child she represented and the child's need for permanency. *Id.* at *3. Our Memorandum Decision noted that at no time during oral argument did Ms. Thompson take responsibility for her failure to file briefs which resulted in delaying the child's permanent placement for at least four months. *Id.* at *3. We noted that our referral to the ODC was not an expression of opinion as to whether disciplinary action should be initiated or how such proceedings should be resolved. *Id.* at *3.

As directed, the Clerk's Office sent this matter to the ODC on September 30, 2015. By letter dated October 2, 2015, the ODC opened and docketed a complaint and sent it to Ms. Thompson requesting a verified response. Ms. Thompson, by and through counsel, filed an Answer/Affidavit, and the matter proceeded to discovery and hearing.

In addition to the testimony of the staff assistant and staff lawyer in the Clerk's Of-

fice, the HPS also heard from a staff member with the Supreme Court Administrative Office who testified regarding the nature and high importance of abuse and neglect proceedings. Ms. Thompson's mother, the Honorable Miki Thompson, Judge of the Circuit Court of Mingo County, testified that, during the relevant time-frame, Ms. Thompson was under significant stress and strain due to the tragic death of her sister and due to attempting to act as counsel in a challenging wrongful death action arising from that death. Judge Thompson testified that the emotional strain was relieved when they were able to obtain counsel to undertake representation in the wrongful death action. According to Judge Thompson, her daughter understands her violations of the Rules and is unlikely to make the same mistakes again.

Marcia Rumora, an attorney practicing in Mingo County, testified regarding her work experiences with Ms. Thompson. She characterized Ms. Thompson as being "very sharp," "professional," and a "strong advocate." Ms. Rumora was "shocked" to learn that Ms. Thompson had disobeyed a court order because it was so far removed from her experiences with Ms. Thompson. She suggested the failure was due to office problems and perhaps the death of Ms. Thompson's sister, which resulted in Ms. Thompson caring for her niece and handling a wrongful death action—all without taking time to grieve. Ms. Rumora indicated that the public would not suffer in the event Ms. Thompson was permitted to continue to practice.

The foster parents of the child, who are the pre-adoptive parents, also testified regarding their disappointment in the delay due to the failure of Ms. Thompson to file her briefs. While they agreed that no actual harm was suffered by the child, they spoke about the emotions involved, the worry and fear delay causes, and the stress of having to continually deal with DHHR for all sorts of things such as approvals for physician visits and to go on family outings and vacations while waiting on a permanency decision.

As indicated above, Judge Cummings testified regarding his experiences with Ms. Thompson. Judge Cummings was familiar with the work of Ms. Thompson in her role as an attorney in abuse and neglect, juvenile, and criminal cases. He often appointed her to serve as guardian ad litem in abuse and neglect cases. He found Ms. Thompson to be competent in all cases in which she served as counsel. Judge Cummings testified that Ms. Thompson was a zealous and passionate advocate on behalf of infants and all her clients. He further testified as to his role in the underlying case and his advice and directive to Ms. Thompson to file the briefs. With knowledge of the failure to file, Judge Cummings offered the opinion that Ms. Thompson was competent to practice law. Judge Cummings also stated that, outside the instance of her failure to file the briefs, he finds Ms. Thompson to be very professional and to exceed the standards of professionalism for much of the bar in Mingo County. He further indicated that he believed the error in judgment had "registered" with her and thought it unlikely she would repeat the conduct. Finally, Judge Cummings testified that Ms. Thompson had learned her lesson and that he "would not hesitate to use her again."

### B. Violations Found by the Hearing Panel Subcommittee

The ODC and Ms. Thompson presented the HPS with joint stipulations as to Ms. Thompson's violations of the Rules of Professional Conduct. The HPS determined that the stipulated violations were supported by clear and convincing evidence and found the following violations:

a. Because Respondent failed to timely file a brief or a summary response as a guardian ad litem for a child in the abuse and neglect case, she has violated Rules 1.1 [competence], 1.3 [diligence], and 8.4(d) [prejudice to the administration of justice] of the Rules of Professional Conduct.

b. Because Respondent failed to zealously advocate for her client, the child, in the abuse and neglect proceedings and because her own actions caused delay and potential harm to the minor child by delaying permanency by several months, she has violated Rule 1.1 [competence], 1.2 [failure to take necessary action on minor's behalf to achieve ultimate goal of permanency], and 1.7 [conflict of interest] of the Rules of Professional Conduct.

c. Because Respondent failed to obey the March 13, 2015, and April 16, 2015 Orders from the Supreme Court to file a brief or summary response by May 20, 2015; failed to obey the May 27, 2015 Order from the Supreme Court to file a brief or summary response by June 1, 2015, and because Respondent's actions resulted in her being held in contempt by the highest court in our State, she has violated Rule 8.4(d) [prejudice to the administration of justice] and Rule 3.4(c) [knowingly disobeying an obligation under the rules of a tribunal] of the Rules of Professional Conduct.

### C. Factors Considered by the Hearing Panel Subcommittee

The four factors that must be considered by the HPS in addressing lawyer disciplinary matters are set forth in Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure. The first factor is whether the lawyer violated a duty owed to a client, to the legal system, or to the profession. The second factor is whether the lawyer acted intentionally, knowingly, or negligently. The third factor is the extent of the actual or potential injury. The fourth factor is the existence of any aggravating or mitigating factors.

Regarding the first factor, the HPS found that Ms. Thompson violated duties owed directly to her client by failing to timely communicate to the Court her position on behalf of the child. Additionally, the HPS found that Ms. Thompson violated duties owed to the legal system and to the profession. The HPS observed that the courts, attorneys, and parties involved were required to invest additional resources in the abuse and neglect proceedings as a result of Ms. Thompson's failure to comply with her obligation to file briefs in the appeal.

As to the second factor, the HPS found that Ms. Thompson's conduct was knowing and intentional. The HPS found that the initial failure to file the briefs was an unintentional act resulting from law office management issues. However, the HPS concluded that, once Ms. Thompson became aware of the missed briefing deadlines, she intentionally and knowingly chose not to file the briefs based on a belief that "this would somehow

help remedy the problems she perceived with Mingo County DHHR."

With respect to the third factor, regarding actual or potential injury, the HPS found that the delay in filing briefs resulted in potential injury due to delaying permanency of placement of a child. The HPS remarked: "While difficult to quantify precisely, there can be no doubt that Respondent contributed to a delay in permanency of at least several months."

As to the fourth factor, involving the presence or absence of aggravating or mitigating factors, the HPS found the presence of both. The HPS found Ms. Thompson's conduct constituted multiple offenses beginning with a lack of diligence which could have been easily cured. Instead, Ms. Thompson failed to correct her mistake and engaged in a knowing and intentional failure to meet her duty and respond to Court orders. The HPS concluded that Ms. Thompson repeatedly refused to acknowledge her wrongful conduct by failing to comply with the many opportunities afforded by the Clerk's Office to correct her failure to file briefs. The HPS also cited the failure to follow Judge Cummings' instruction to file the briefs. Additionally, the HPS noted the refusal to acknowledge wrongful conduct by Ms. Thompson at oral argument before this Court. The "strongest aggravating factor" found by the HPS was the vulnerability of the infant client who had no means by which to protect himself from the conduct of Ms. Thompson.

As to mitigating factors, the HPS cited Ms. Thompson's lack of a prior disciplinary record and her inexperience in the practice of law. The HPS also considered that, to some extent, Ms. Thompson had already suffered penalty due to her inability to serve as a guardian ad litem during the pendency of the disciplinary proceedings which has had a significant impact on Ms. Thompson's practice. Finally, the HPS found that Ms. Thompson's involvement as counsel in her sister's wrongful death action was also a mitigating factor.

### D. The Hearing Panel Subcommittee's Recommended Sanctions and the Objections of the Office of Disciplinary Counsel and of Ms. Thompson

To this Court, the HPS recommends that Ms. Thompson (1) be suspended from the

practice of law for a period of three months; (2) attend an additional twelve hours of CLE in the area of abuse and neglect and/or law office management prior to petitioning for reinstatement; (3) comply with Rule 3.28 of the Rules of Lawyer Disciplinary Procedure regarding the duties of suspended lawyers; (4) be required to petition for reinstatement pursuant to Rule 3.29 of the Rules of Lawyer Disciplinary Procedure; and (5) pay the costs of the disciplinary proceeding.

The ODC argues that the appropriate sanction is an eighteen month suspension. The argument of the ODC for a greater sanction is grounded in large part on the grave importance of abuse and neglect proceedings, the heightened scrutiny they are afforded, and the vital role of guardians ad litem in serving as the voice for vulnerable infants. Additionally, it is strenuously argued by the ODC that Ms. Thompson intentionally and knowingly held the case hostage, thereby delaying a permanency determination, because she was agitated about issues in other cases unrelated to her representation of the child in this case. Further, the ODC asserts that Ms. Thompson continued her delay and flagrant failure to abide by court orders and directives despite numerous opportunities provided by the Clerk's Office, and despite explicit directions from Judge Cummings to file the briefs. Additionally, the ODC considers Ms. Thompson to be unrepentant and incapable of understanding the significance of her actions.

Ms. Thompson objects to the recommended three month suspension and argues that she should be publicly reprimanded. In the alternative, she requests that this Court adopt the three month suspension recommended by the HPS. However, Ms. Thompson also requests that she receive credit for the time the Court has prohibited her from being appointed to abuse and neglect and criminal cases. Ms. Thompson contends that she believed she was acting in the best interest of her client and other children when she committed the serious error of judgment regarding how she chose to address deficiencies with CPS and DHHR in Mingo County. She also notes she was not motivated by dishonesty or self-interest. There was no im-

moral or illegal behavior. Ms. Thompson states that she has suffered public humiliation and shame due to the negative media attention directed at her in Mingo County once the contempt order became public. She claims she has suffered a devastating blow to her practice and been shamed by her colleagues. Ms. Thompson states she is remorseful and will carry the consequences of her wrongful and misguided behavior for the rest of her life. She further indicates she has accepted responsibility for her conduct as demonstrated by her cooperation with the ODC in stipulating to relevant facts and agreeing to violations of the Rules of Professional Conduct.

## II.

### STANDARD OF REVIEW

The standard of review in lawyer disciplinary matters is as follows:

A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

Rule 3.7 of the West Virginia Rules of Lawyer Disciplinary Procedure provides: "[i]n order to recommend the imposition of discipline of any lawyer, the allegations of the formal charge must be proved by clear and convincing evidence."

Furthermore, while we respectfully consider the HPS's recommendations, it is well-settled that "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3,

*Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984). Guided by these principles, we evaluate this disciplinary action.

## III.

## DISCUSSION

██ Ms. Thompson stipulated to violations of the Rules of Professional Conduct including two violations of Rule 1.1 [1] (competence) and Rule 8.4(d) [2] (prejudice to the administration of justice), and to violations of Rule 1.3 [3] (diligence), 1.2 [4] (failure to take necessary action on minor's behalf to achieve goal of permanency), 1.7 [5] (conflict of interest), and 3.4(c) [6] (knowingly disobeying an obligation under the rules of a tribunal). The HPS found that there was clear and convincing evidence of the stipulated violations. Likewise, our review of the record compels the conclusion that clear and convincing evidence established Ms. Thompson's violation of the Rules as stipulated to and as determined by the HPS.

██ We now turn our attention from the issue of the HPS findings to the question of the appropriate sanctions to be imposed on Ms. Thompson. The various permissible sanctions for violations of the Rules of Professional Conduct are set forth in Rule 3.15 of the Rules of Lawyer Disciplinary Procedure, which provides:

A Hearing Panel Subcommittee may recommend or the Supreme Court of Appeals may impose any one or more of the following sanctions for a violation of the Rules of Professional Conduct ...: (1) probation; (2) restitution; (3) limitation on the nature or extent of future practice; (4)

supervised practice; (5) community service; (6) admonishment; (7) reprimand; (8) suspension; or (9) annulment. When a sanction is imposed, the Hearing Panel Subcommittee or the Court shall order the lawyer to reimburse the Lawyer Disciplinary Board for the costs of the disciplinary proceeding unless the panel or the Court finds the reimbursement will pose an undue hardship on the lawyer. Willful failure to reimburse the Board may be punished as contempt of the Court.

██ In devising suitable sanctions for attorney misconduct, this Court has recognized that "[a]ttorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Lawyer Disciplinary Bd. v. Taylor*, 192 W.Va. 139, 144, 451 S.E.2d 440, 445 (1994). We are also mindful of the role of deterrence in disciplinary sanctions as set forth in this Court's holding in Syllabus point 3 of *Committee on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987):

In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

██ With these principles in mind, we proceed to consider the four factors to be

---

1. Rule 1.1 provides "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

2. Rule 8.4(d) provides "[i]t is professional misconduct for a lawyer to: ... engage in conduct that is prejudicial to the administration of justice;...."

3. Rule 1.3 provides "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

4. Rule 1.2, in part, provides "[a] lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation...."

5. Rule 1.7, in part, provides "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest...."

6. Rule 3.4(c) provides "[a] lawyer shall not: ... knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists; ...."

addressed when imposing sanctions. As this Court has previously recognized,

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court or Board shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

Syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998).

After a thorough review of the record in this case, we agree with the analysis of the HPS as to the first three factors to be evaluated when imposing sanctions. Specifically, as to the first factor, Ms. Thompson failed in her obligation to protect the best interests of her infant client when she refused to file responses in the appeals of the mother and the father in the abuse and neglect proceedings despite repeated requests, instruction, and orders. Rule 11(h) of the West Virginia Rules of Appellate Procedure addresses the responsibilities of guardians ad litem: "The guardian ad litem for any minor child involved in an abuse and neglect appeal must file a brief—or a summary response in an appropriate case...." Ms. Thompson further violated the duties she owed to the legal system and to the profession when she failed to represent her infant client's interests, choosing instead to hold the child's case hostage in a grossly misplaced attempt at advancing her views regarding the perceived failures of DHHR in Mingo County. The delay resulting from Ms. Thompson's blatant refusal to file briefs caused the additional expenditure of time and resources for the parties, other attorneys, the Circuit Court of Mingo County, and this Court.

As to the second factor, we agree with the HPS that Ms. Thompson's initial failure to file the required briefs was unintentional. However, once the Clerk's Office successfully communicated with Ms. Thompson on June 8, 2015, the conduct of Ms. Thompson transformed to that of a knowing and intentional failure to discharge her duty to the child, the legal system, and the profession in her unreasonably misguided quest to challenge DHHR practices in Mingo County unrelated to the child involved in the instant proceeding.

We also agree with the HPS that the injury and potential for injury in this case is clear. A hallmark of child abuse and neglect proceedings is that they are afforded the highest priority by our courts and must be resolved as expeditiously as possible in order to protect the child's development, stability, security, and well-being. *See, e.g.,* Syl. pt. 4, *In Re Emily*, 208 W.Va. 325, 540 S.E.2d 542 (2000); Syl. pt. 3, *In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996). Ms. Thompson's conduct caused injury by delaying the appellate process and thereby prolonging the permanency determination.

We finally examine the presence of both aggravating and mitigating factors in order to ascertain the proper sanction to be imposed. As we held in Syllabus point 2 of *Lawyer Disciplinary Board v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003), "[m]itigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." We further held in Syllabus point 3 of *Scott*,

> [m]itigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary pro-

ceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

*Id.* Conversely, "[a]ggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. pt. 4, *id.*

We first consider mitigating factors. The HPS found three mitigating factors as stipulated by the ODC and Ms. Thompson: (1) absence of a prior disciplinary record, (2) inexperience in the practice of law, and (3) imposition of other penalties in the form of her ineligibility for appointed work. Additionally, the HPS found Ms. Thompson's involvement as counsel in the wrongful death action regarding her sister affected her judgment during the relevant time-frame. We agree with the findings of the HPS as to mitigating factors. We also observe that the record establishes that the preclusion from appointed criminal and abuse and neglect proceedings over the course of the last eighteen months has affected Ms. Thompson's practice. Appointed work constituted a large portion of Ms. Thompson's solo practice in a rural part of the State. As a consequence of the embargo on appointed work, Ms. Thompson's revenues are down some ninety percent, which resulted in her moving to less satisfactory office space and the financial inability to employ a secretary. In addition to the mitigating factors found by the HPS, we also find the absence of a dishonest or selfish motive. Although gravely misguided in her approach, Ms. Thompson's testimony demonstrates that her failure to represent the child grew out of frustrations related to systemic concerns with DHHR that she believed affected all children involved in abuse and neglect proceedings in Mingo County.

In addition to the findings of the HPS, we further find that Ms. Thompson has demonstrated remorse. During the period of refusal to file briefs, Ms. Thompson believed the child was safe and secure with good and loving foster parents who sought adoption of the child such that any delay she caused would not result in harm. Ms. Thompson states that she now understands the concerns of the foster parents regarding the delay and lack of permanency determination. Ms. Thompson stated she realized what she had done was wrong, recognized her errors in judgment, meant no disrespect to the authority of the courts or court staff, and candidly acknowledged it took a "lot of stepping back to understand" her failures and violations of the Rules. Finally, as to mitigating factors, we find that by working toward stipulations of fact, violations, and factors considered in terms of sanctions, Ms. Thompson demonstrated a cooperative attitude toward the proceedings.

We now turn to consideration of aggravating factors. The HPS concluded there were aggravating factors because Ms. Thompson's wrongful conduct constituted multiple offenses which she repeatedly refused to acknowledge despite the many opportunities for correction provided by the Clerk's Office and the directions of Judge Cummings. Additionally, the HPS found the strongest aggravating factor was the vulnerability of the infant client. We agree with the conclusions of the HPS. We find that, once again, we must stress that abuse and neglect proceedings are afforded the utmost priority on the dockets of circuit courts and this Court. We have repeatedly held that abuse and neglect matters must be resolved fairly, expediently, and efficiently so as to safeguard the well-being of children. *See, e.g.,* Syl. pt. 4, *In Re Emily,* 208 W.Va. 325, 540 S.E.2d 542 (2000); Syl. pts. 1 & 5, *In re Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991). Ms. Thompson lost sight of these principles and thereby failed in her duties to the vulnerable child she was appointed to represent. Instead, she used the child as a vehicle to advance her quest regarding perceived systemic failures of DHHR.

In assessing the appropriate sanction to be imposed, we examine Ms. Thompson's conduct in light of both mitigating and aggravating factors. In so doing, we note that in *Lawyer Disciplinary Board v. Conner,* 234 W.Va. 648, 769 S.E.2d 25 (2015), we fashioned a ninety-day suspension after finding the thirty-day suspension recommended by the HPS was "too lenient for behavior that has become a clear pattern of wrongdoing."

*Id.* at 657, 769 S.E.2d at 34. The behavior in *Conner* included multiple failures to meet deadlines in criminal appeals, failures to communicate with clients, failure to keep clients informed, failure to appear before this Court at a rule to show cause hearing, failure to return the unearned portion of attorney fees after discharge, failure to place retainer fees in a client trust account, and failure to file a response brief with this Court in connection with disciplinary proceedings. The conduct at issue in *Conner* was determined to be negligent.

It is recognized in *Lawyer Disciplinary Board v. Sturm*, 237 W.Va. 115, 785 S.E.2d 821 (2016), that this Court found the recommended sanction of reprimand to be too lenient. Instead, we imposed, in part, a ninety-day suspension from the practice of law. In *Sturm*, the conduct consisted of neglecting to file a habeas corpus petition, failing to contact the incarcerated client, neglecting to seek the client's consent to accept compensation for representation from a third party, failing to maintain a normal attorney-client relationship, failing to deposit the retainer fee in the client trust account, and disregarding the obligation to provide a refund of the unearned portion of the retainer fee. Additionally, the conduct in *Sturm* involved ignoring the duty to file an appeal in a criminal case after being court-appointed to do so, failing to communicate with the client, and failing timely to withdraw or attempt to withdraw from representation. There was also a history of similar prior conduct that had resulted in an admonishment from the Investigative Panel of the Lawyer Disciplinary Board. We expressed our concern for the repetitive conduct and propensity to ignore requests from the ODC and this Court. In imposing the ninety-day suspension of the practice of law, we also indicated our heightened concern regarding the large volume of court-appointed cases handled by the lawyer. The conduct of the lawyer in *Sturm* was determined to be negligent.

Ms. Thompson argues that her conduct is analogous to the conduct at issue in *Lawyer Disciplinary Board v. Grindo*, 231 W.Va. 365, 745 S.E.2d 256 (2013), wherein we imposed a sanction of public reprimand. In *Grindo*, the lawyer failed to timely perfect appeals in two matters pending before this Court, including one involving the representation of a father in an abuse and neglect proceeding. In *Grindo*, there were findings of a significant number of mitigating factors including institution of several significant remedial measures in the law office management and practice. Additionally, there were serious medical issues involving the lawyer's son that dominated the time and attention of the lawyer during the relevant time period. The conduct was determined to be a knowing and intentional violation of duties owed to his clients and the legal system.

The ODC argues that *Grindo* is distinguishable. We agree and find the conduct at issue in *Grindo* to be distinguishable, in part, due to the nature of the extensive remedial acts voluntarily undertaken by the lawyer. We conclude that, although there is a mix of both negligent and intentional conduct in the instant case, the violations and conduct of Ms. Thompson are more akin to that of the lawyers in *Conner* and *Sturm*. We are influenced by the imposition of ninety-day suspensions in those cases.

In deciding the sanction to be imposed, we consider that the testimony of Ms. Thompson regarding her thoughts and actions during the period of refusal to file briefs, despite the entreaties of this Court and Judge Cummings, is confusing at best. As the guardian ad litem, Ms. Thompson agreed with the position of the DHHR as to termination of parental rights and ultimately filed briefs with this Court supporting termination. Nevertheless, before the HPS, Ms. Thompson testified that she did not agree with the DHHR's allegation that the mother was unfit stating, "it was an insane case from the start." She testified that the proceedings were unfair because there was not "enough" of a complaint and the child was deprived of his mother. She stated her belief that, at the time of the appellate process, she was "standing here shouting, going, hey, this isn't right, something's not right." And, yet, Ms. Thompson conceded she placed none of her concerns on the record. Ms. Thompson further testified that, after the appeals came to her attention in June 2015, she started realizing

that the systemic concerns she had about DHHR also impacted this case. She understood that the mother "would've had more of a chance had something else happened, I just—I was crazy at the time. I was dug in." The testimony seems to be directed at the notion that DHHR handles things in such a way that biological parents simply give up and disappear, which makes termination an easy option. She suggests that the mother of the child was affected by a caseworker turning her in on a probation violation, which resulted in jail time. Additionally, Ms. Thompson suggested that the mother was wrongly subjected to a joint visitation with the father who had physically abused her because DHHR did not have time to set up two visitations. Ms. Thompson was critical of gaps in time where there was no contact with the mother and no effort was made to determine the reason for the lack of contact. Instead, it was "[j]ust another mom that's gone." [7]

It took multiple attempts by HPS members to get answers to the question of whether, at the time she ultimately filed her briefs, she believed her recommendation supporting termination was in the best interest of the child. The answer was that any "hopes" she had for the mother were "speculative" [8] because the mother had a lot of issues. Ms. Thompson testified she started "second-guessing everything" and believed things were "screwed up." Although she did not change her recommendation supporting termination, her thinking was to let this Court know that things were "messed up." Plainly, that reasoning was devoid of logic. The thinking makes no sense, especially when considered in light of her complaint to this Court that the parents were "disinterested" and her suggestion that those who file appeals in abuse and neglect cases should be required

to show active and willing participation by the petitioners. We are confounded inasmuch as her briefs to this Court raised no issues regarding DHHR, or any other matter, with respect to the child she was charged to represent.

Perhaps Ms. Thompson intended to orally communicate how "messed up" things were to this Court on September 2, 2015. However, that did not occur because she did not appear. We are troubled by Ms. Thompson's testimony that, absent an emergency situation and schedule conflict, her intent was to simply show up before this Court on September 2, 2015, at the rule to show cause hearing, without filing the required briefs so that she could address her perceived systemic concerns. Apparently, the schedule conflict prompted Ms. Thompson to consider that others were telling her to file her briefs, "and you're stupid for trying this and just file your answer, so I did." Accordingly, she filed the briefs on September 1, 2015, representing that she supported the termination of parental rights.

We adopt the HPS recommendation of a sanction consisting, in part, of a three month suspension from the practice of law. In adopting the recommended three month suspension, we give considerable deference to the testimony of Judge Cummings who has had an opportunity to directly observe Ms. Thompson's conduct and professionalism in appointed cases. We are also cognizant of the fact that the preclusion from appointed cases since September 2015, as applied to a small solo practice in rural Mingo County, substantially reduced the ability of Ms. Thompson to practice law in the fashion she had developed. This Court is mindful of the important role of deterring unacceptable conduct when

7. We note that none of Ms. Thompson's concerns are borne out by the record established in the abuse and neglect proceedings regarding the mother or father of the child. Rather, the multiple factors supporting the terminations of parental rights are set forth in this Court's memorandum decisions. There, we discuss, in some detail, serious safety and habitability concerns, probation violations, family violence, signs of drug use, and failures to follow through with rehabilitation services. See In re A.N., No. 15-0185, 2015 WL 5738010 (W. Va. Sept. 30, 2015) (memorandum

decision); In re A.N., No. 15-0208, 2015 WL 9693898 (W. Va. Sept. 30, 2015) (memorandum decision).

8. We have held that "courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened. . . . ," Syl. pt. 1, in part, In re R.J.M., 164 W.Va. 496, 266 S.E.2d 114 (1980).

designing appropriate sanctions. We are all too aware of the increasing pattern of untimely, inadequate, and perfunctory filings, submissions, and representation of those lawyers appointed to the vital role of guardian ad litem in abuse and neglect proceedings. Lawyers with practices including representation of children and respondents in abuse and neglect proceedings should consider this opinion, the sanction of suspension, and the length of preclusion from appointment during the disciplinary process as a cautionary tale. We also adopt the recommendation of the HPS that Ms. Thompson complete an additional twelve hours of continuing legal education in the area of abuse and neglect and/or ethics and law office management. In light of the three month suspension, reinstatement shall be automatic pursuant to Rule 3.31 of the Rules of Lawyer Disciplinary Procedure. Additionally, Ms. Thompson shall pay the costs of the disciplinary proceedings in accordance with Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

## IV.

## CONCLUSION

For the foregoing reasons, we adopt, as moulded, the following sanctions of the Hearing Panel Subcommittee: (1) that Ms. Thompson's law license be suspended for a period of three months, and Ms. Thompson is directed to abide by the duties imposed pursuant to Rule 3.28 of the Rules of Lawyer Disciplinary Procedure; (2) that Ms. Thompson complete an additional twelve hours of continuing legal education in the area of child abuse and neglect proceedings and/or in the area of ethics or law office management; (3) that Ms. Thompson pay the costs and expenses incurred by the ODC in the prosecution of this proceeding prior to her reinstatement to the practice of law; and (4) that reinstatement shall be automatic pursuant to Rule 3.31 of the Rules of Lawyer Disciplinary Procedure.

Law License Suspended and other Sanctions.

CHIEF JUSTICE LOUGHRY dissents and reserves the right to file a dissenting opinion.

JUSTICE WORKMAN concurs in part, and dissents in part, and reserves the right to file a separate opinion.

Loughry, C.J., dissenting:

Never before has this Court been faced with a lawyer disciplinary case of this nature. While it is commonplace for this Court to determine the appropriate discipline for attorneys who fail to act timely or zealously, there is almost always a cogent explanation offered for such conduct. Disorganization, lack of adequate support, case or practice management issues, personal issues, or simple neglect essentially form the universe of proffered explanations. While none of these serve to "excuse" lawyer misconduct, they at least provide a rational context for the conduct we are obligated to examine. In the instant case, however, the respondent's willful refusal to timely file briefs on behalf of her infant client, despite multiple court orders to do so, defies any rational explication. Moreover, the myriad and ever-evolving justifications offered by the respondent range from half-hearted to confounding to infuriatingly ill-conceived, to put it mildly. Despite the respondent's protestations to the contrary, this case involves more than a mere failure to file or comply with a court order: it involves a complete, willful abdication of an attorney's duties to the most vulnerable client known to our judicial system, under circumstances where that client was most in need of representation. Accordingly, I respectfully dissent.

By way of factual background, the respondent was appointed as guardian ad litem for an infant in abuse and neglect proceedings which resulted in the termination of the biological mother's and father's parental rights. The termination of each parent's rights was separately appealed, and the briefing schedules entered by this Court required the respondent to file a response brief in each of the two appeals by May 20, 2015. After the respondent failed to do so, this Court's Clerk's Office telephoned the respondent to advise that her briefs were past due. Receiving no response to that telephone inquiry, this Court issued a Notice of Intent to Sanc-

tion and Amended Scheduling Order requiring the respondent to file briefs on behalf of her infant client by June 1, 2015. After the respondent again failed to file her briefs, the Clerk's Office emailed her on June 5, 2015, to advise of the Notice of Intent to Sanction; the respondent replied that she had "no idea what is going on" and would "figure out what has happened today."

On June 11, 2015, this Court issued a rule to show cause returnable for September 2, 2015, unless sooner mooted by the filing of compliant briefs. The Clerk's Office then called the respondent on *five* separate occasions prior to September 2; *none of the calls were returned.* On September 1, 2015, the respondent finally filed her response briefs along with a motion for leave to file out of time that blamed staffing issues and calendaring errors. Just two weeks prior, however, she told the circuit court that she had not filed the briefs because she was "irritated" about "other issues" *unrelated to this child client's case.*

Another rule to show cause was issued returnable on September 16, 2015; the respondent filed a faxed response on September 9, this time blaming her refusal to file her briefs on "action and inaction" by the Mingo County DHHR and stating that "[i]n an effort to get my concerns before an alternate Court, the undersigned refused to file a Response in the above referenced case." The respondent then went on to promptly abandon this premise and boldly criticize the Court for accepting appeals by parties (presumably the biological mother and father) who were not "active, willing participants" and offering her brazen recommendation that "additional measures should be implemented prior to accepting petitions of disinterested parties for review." She complained that somehow the Court's hearing of appeals filed by parties' attorneys without the parties' written endorsement was "not realistic" and did not make "economic sense." Not satisfied with the presumptuous position taken in her response, the respondent attached her own affidavit stating that she "was advised that this was not a good way to go about [resolving the issues at the Mingo County DHHR]" but complaining that the DHHR's actions

had left her "enraged" and she hoped her position would not be viewed as "foot-stomping" and "whining."

On September 16, 2015, the respondent appeared before this Court and feebly reiterated to the Court that she had intentionally refused to comply with the Court's orders because she wanted a forum with the Court to air her grievances against the Mingo County DHHR. Following argument on the rule to show cause, the respondent, still blithely unaware of her continued inappropriate behavior, wrote to this Court citing her "sense of moral indignation" for her actions and complaining that the underlying case involved "just a missed deadline," but that her "heels were dug in[.]" She explained that she refused to respond to this Court's telephone inquiries because she had "made it clear what I intended to do" and was "worried that I would make it a confrontation." She was careful to conclude that despite her appearance at the Court, "oral argument is something I believe I excel at[.]" The Court thereafter found the respondent in contempt and ordered that she be prohibited from accepting court appointments pending an investigation by the Office of Disciplinary Counsel ("ODC") and the resolution of any disciplinary action. In her written response to the formal disciplinary Statement of Charges, the respondent shockingly denied that she "knowingly disobeyed her obligation to the Court," chalking up her contemptuous conduct as a "bad decision."

I.

Before addressing the respondent's conduct and the discipline I believe to be warranted, this case demands a reiteration of what I trust will be the final warning to that small, yet unrelenting portion of the Bar who continue to disregard this Court's instructions regarding their obligations when serving as guardians ad litem in abuse and neglect matters. Rule 18a of the Rules of Procedure for Child Abuse and Neglect require guardians ad litem to fully comply with the "Guidelines for Children's Guardians *Ad Litem* in Child Abuse and Neglect Proceedings," as set forth in Appendix A of the Rules. The Guidelines provide that the Rules

of Professional Conduct apply to the representation and painstakingly outline the guardian's duties at each stage of the proceedings. The Guidelines explain that with respect to post-dispositional representation, the guardian ad litem must

[a]ctively participate and timely file a response in any appeal, extraordinary writ, modification, or action ancillary to the abuse and neglect proceeding including proceedings to address the disruption of a permanent placement which affect the recommendations of the GAL. If an appeal is filed by another party in an abuse and neglect case, the GAL is required to file a respondent's brief or summary response that adheres to the requisite provisions of Rule 11 of the Rules of Appellate Procedure.

Appendix A, Section E(3). Additionally, Rule 52(g) of the Rules of Procedure for Child Abuse and Neglect cautions that "[t]he duties and responsibilities of a child's guardian ad litem shall continue until such child has a permanent placement, and the guardian ad litem shall not be relieved of his responsibilities until such permanent placement has been achieved."

Moreover, this Court has *repeatedly* instructed guardians ad litem of the full scope of their duties to their infant clients. *See State v. Michael M.*, 202 W.Va. 350, 356 n.11, 504 S.E.2d 177, 183 n.11 (1998) ("We again underscore that guardians ad litem have a duty to fully represent the interests of their child wards at all stages of the abuse and/or neglect proceedings, both in the circuit court and on appeal."); *In re Katie S.*, 198 W.Va. 79, 91 n.16, 479 S.E.2d 589, 601 n.16 (1996) ("Part of [the guardian ad litem's] representation is to file an appellate brief to insure that [his or her] clients' interests are presented."); *In re Christina L.*, 194 W.Va. 446, 454 n.7, 460 S.E.2d 692, 700 n.7 (1995), ("[I]t is [the guardian ad litem's] responsibility to represent [his or her] clients in every stage of the abuse and/or neglect proceedings. This duty includes appearing before this Court to represent the child during oral arguments."); Syl. Pt. 5, *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991) ("The guardian ad litem's role in abuse and neglect proceedings

does not actually cease until such time as the child is placed in a permanent home."). After continued disregard of these instructions, the Court once again recently observed:

The Court continues to observe an increasing pattern of inadequate and untimely filings made by guardians ad litem in abuse and neglect appeals.... *[W]e wish to re-emphasize how vitally important it is for guardians ad litem to comply with Rule 11(h) of the Rules of Appellate Procedure and this Court's orders in a timely fashion so that abuse and neglect appeals can be promptly and efficiently resolved.* Guardians ad litem must submit a response brief or summary response that specifically responds to each of the assignments of error raised on appeal. Also, if the appendix lacks documents from the record that are essential for the Court's review of the case, it is the guardian ad litem's obligation to file a motion to supplement the appendix to ensure that the necessary parts of the record below are included on appeal.

*In re B.L.*, No. 14-0660, 2015 WL 3631681, at *2 (W.Va. June 10, 2015) (memorandum decision) (emphasis added).

The reasons for the Court's frustration are manifest. We have made clear to the lower courts and practitioners alike that "[c]hild abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. Pt. 1, in part, *In the Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). Moreover, "matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and ... such proceedings must be resolved as expeditiously as possible." *Id.* at 616, 408 S.E.2d at 368, syl. pt. 5, in part. The paramount reason for this need for prioritization is to establish, as expeditiously as our system will allow, permanency for the children whose lives have been placed into unimaginable turmoil by such proceedings. As Justice Workman eloquently stated more than twenty years ago:

[T]he early, most formative years of a child's life are crucial to his or her development. There would be no adequate remedy at law for these children were they permitted to continue in this abyss of uncertainty. We have repeatedly emphasized that children have a right to resolution of their life situations, to a basic level of nurturance, protection, and security, and to a permanent placement.

*State ex rel. Amy M. v. Kaufman*, 196 W.Va. 251, 257, 470 S.E.2d 205, 211 (1996). It is therefore clear that any delays not demanded by due process cannot and will not be tolerated in the context of abuse and neglect proceedings.

With regard to those attorneys representing infant clients in these proceedings, this Court has aptly observed that involvement in abuse and neglect proceedings commands "wisdom, compassion, and the strength to protect the children to the greatest degree possible from physical and emotional harm, and to create stability and safety." *In re N.A.*, 227 W.Va. 458, 471, 711 S.E.2d 280, 293 (2011). Certainly, the overwhelming majority of practitioners who dedicate themselves to accepting guardian ad litem appointments handle these matters with precisely the wisdom and compassion contemplated. Without their considerable experience, judgment, and perspective, our system would be wholly unable to remedy one of our most destructive societal evils—the abuse and neglect of children. These practitioners inherently understand what Justice Rehnquist stated so well:

A stable, loving homelife is essential to a child's physical, emotional, and spiritual well-being. It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens. The same can be said of children who, though not physically or emotionally abused, are passed from one foster home to another with no constancy of love, trust, or discipline

*Santosky v. Kramer*, 455 U.S. 745, 788–89, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (Rehnquist, J., dissenting). It is because of these practitioners' Herculean efforts that the re-spondent's conduct, and those who similarly neglect their guardian ad litem obligations, is so offensive. It is in deference to these dutiful and conscientious practitioners that the conduct at bar commands a harsher sanction, as discussed more fully below.

## II.

The foregoing gives proper context to the demonstrably outrageous conduct of the respondent. As indicated above, the respondent failed to file briefs on behalf of the infant for more than three months and in the face of numerous orders and contacts requiring her to do so. Since the matter was stayed in the circuit court pending appeal, the permanency plan of adoption of the infant could not go forward. The respondent initially blamed staffing problems and calendaring mistakes for her failure to file her briefs. When pressed, however, the respondent admitted that she willfully refused to file her responses under some misguided belief that, by acting in contempt of this Court's orders, she would be granted an audience with the Court to address neither the merits of the underlying appeals nor her own malfeasance, but systemic issues she perceived within the Mingo County DHHR. Incredibly, at a status conference in the underlying matter held just prior to the scheduled return on the rule to show cause order, the respondent demonstrated her inexplicably ardent belief that the rule to show cause was some sort of invitation by this Court to appear and edify us about her perceived concerns with the DHHR. After announcing that she had yet to file her response briefs, the following exchange occurred in circuit court:

Respondent: Judge, as I've probably mentioned before, I'm agitated on other issues. They've invited me to come up and speak to the Supreme Court, which I'm tempted to—

The court: They've invited you or told you to?

Respondent: If it's not done by a certain date, then I can come on up. I don't know—it's like *this case isn't impacted by the reason I'm dragging my feet.*

*I should probably just submit it,* but you know, I've had—last week I had a child that should have her college paid for not get Chafee funds because the Department won't do their job and it's like—

(Emphasis added). After explaining that the circuit court could not advance the matter toward permanency for the infant because the case was stayed pending appeal, the circuit court directed the respondent to file her appellate briefs:

The court: . . . . But get that filed because they will sanction you.

Respondent: I know.

The court: Because they have written me saying they're going to.

Respondent: They've offered—

The court: And I don't know, I was never officially sanctioned by them.

Respondent: *I don't think they're going to officially sanction me.* They just—

The court: I doubt it, but they've got to do something.

Respondent: They do and I think—I think they need to talk to me.

The court: So if you don't file a response and if I can't get this thing ruled I will sanction you.

(Emphasis added). The hubris of a young attorney can justify forgiveness of a great many missteps, but arrogantly flouting the repeated orders of the State's highest Court, to the detriment of a child, is not one of them.

Before the Hearing Panel Subcommittee ("HPS"), the ODC introduced evidence of how the respondent executed her scheme in circuit court. The adoptive father—who had fostered the infant since the child was four months old—testified that the respondent advised him she "had not filed her brief because she was trying to make a point in another case that she was involved in" and stated "I'm sorry. You know, but I'm trying to make a point." The cavalier attitude of the respondent regarding her conscious refusal to comply with directives of the Supreme Court is astonishing, to say the least. Moreover, her utter disregard for the delay suffered by her infant client in being adopted by a loving family due to matters *wholly unrelated* to the infant's case, is virtually unbelievable.

The respondent's cavalier scheme caused injury to her infant client and the child's prospective adoptive family. In response to questioning by counsel for ODC, the adoptive father explained the effect the uncertainty caused by the respondent's delay had on their family:

Q. Okay. How did that [the respondent's failure to file the briefs] make you feel?

A. Disappointed because any time you're—we were waiting to adopt this child and any kind of delay, it—you always worry. I mean you're—we're emotionally attached to the child and any delay, the longer it takes to get the adoption done, you just never know when something else is going to come up and potentially have them taken from your home or taken from your life.

. . . .

The longer you wait, there's always a chance of an aunt or an uncle that you didn't think or didn't know about to step in and say, hey, we'll adopt. I mean even the assurance that you get, this child is not going anywhere, you never know.

The adoptive father further testified that the infant, who was born prematurely, needed surgery but because of the lack of permanency, the medical treatment and procedures necessitated extensive involvement of DHHR. The father explained further that vacation plans or out-of-town trips were made difficult, if not impossible, due to the need to involve DHHR. In this regard, the respondent obtusely testified "I hate that I have burdened them and made their summer not enjoyable."

Even more poignantly, the adoptive mother—who has cared for this child since he was four months old—emotionally testified that the "limbo" created by the delay prevented

their family from fully bonding as a permanent unit: "It's just like he's mine, but he's not mine." She further explained the uncertainty and fears surrounding the delay in permanency:

> The child is not ours, he's not the parents', he's a ward of the state. That's not fair to him. You can't—let me think, okay, because this tears me up because I love him. You can't do anything with him. He has nobody. Anybody from his other family could've come in and said after two and a half years, three years, we want him and we're all he know. He is our baby. We're his mom and dad. It's his brothers and sisters and until the papers are signed, anybody can take my baby. You know, and how fair is that to him and to us when he's been ours for almost three years for somebody in her family or his family come and say we want him now. And until the papers are signed, that can happen, that can happen. And that's not fair to him. That's not fair to him at all and it's not fair to me at all and it's not fair to my five year old that that's his brother from the time he's come into this world, you know.
>
> . . . .
>
> [Respondent] turned around and said 'I'm sorry I had to use you all as an example, but somebody wasn't doing what they were supposed to do and—and we were pretty much the example.' . . . It hurt my feelings because it's not my fault somebody's not doing what they're supposed to do. I done what I was supposed to do. I was at every court hearing. I done took my baby to every doctor's appointment. I've done everything as a mother that I'm supposed to do. I—I mean it's not my fault. I mean she

should've done what she was supposed to do.

The adoptive mother concluded that "I did not want to be here, I mean, but I don't want to lose my baby either. I mean he's—he is the air I breathe and I'm the air he breathes." Regarding this testimony, the ODC asked the respondent: "Did you understand from listening to the [adoptive parents'] testimony, the impact that you caused on them by the delays?" The respondent's astonishing and incredibly callous response was: "The impact on them are [sic] not my concern." [1] While the respondent paid lip service to her error and expressed general dismay over her actions, she continued to minimize her behavior by maintaining that only four months of the delay in achieving permanency was the result of her actions. In a flabbergasting lack of self-awareness, the respondent feigned concern about the fact that the adoption had not yet been finalized as of the date of her disciplinary hearing, but flippantly conceded: "So June, July, August, September, then we'll count October, those four months are on me. I did that. And I hate that I did that and it sucks."

Notwithstanding the excuses the respondent previously gave the circuit court and this Court, additional purported justifications for her behavior surfaced before the HPS. Both respondent's counsel and mother suggested that the respondent's handling of a wrongful death suit filed on behalf of her sister was to blame for her behavior. It is notable, however, that nowhere in the respondent's own written explanations does she cite this matter as contributing to her actions. In fact, in her seventy-nine pages of testimony before the HPS, the respondent unilaterally referenced her sister's death and lawsuit exactly once.[2] I am entirely sympa-

---

**1.** This attitude is consistent with the respondent's bizarrely skewed perspective throughout her representation of this child. Her response to the show cause order indicated that since the infant was two years old, "the action or inaction of the Guardian at the appeals stage will [not] drastically impact his daily life or future with his foster family." She incredibly stated that because of his tender age, "whether or not paperwork has been finalized is not understood or comprehended at this time and will not positively or negatively contribute to his connection to the home due to his age and the family's awareness of the status

of the respondents and the likely outcome of the appeal."

**2.** The respondent stated simply "there had been so much that went on with [the Supreme Court brief] and my concern about—and I think heavily impacted by my sister, kids need to know their parents." On direct examination by counsel, the respondent was asked what effect the loss of her sister played in the matter, yet her response still centered on the issues with the DHHR: "I believe that knowing a kid could've had contact with his mom and through the things that weren't going down right at the Department, that's

thetic to the respondent's family tragedy and, in fact, personal stressors are frequently raised as explanations for lawyer misconduct. However, where the offending lawyer herself fails to identify this as a contributing or mitigating factor, I am hard-pressed to lend such consideration much weight.

While the respondent failed to implicate her sister's wrongful death suit before the HPS, she did offer yet another explanation for her behavior, this time citing what can only be described as "second thoughts" about her termination recommendation. In testimony that is, at best, equivocal, and at worst, incomprehensible, the respondent seemed to suggest that because of the aforementioned alleged systemic inadequacies with the Mingo County DHHR, she had become distrustful of her original recommendations of termination in this proceeding. The respondent spoke at length about her client's biological mother and whether the DHHR had failed her, all the while acknowledging that she did not alter her recommendation for termination when she finally filed her briefs with this Court.[3] This newly-articulated rationale is disingenuous and contradicted by every action the respondent took.

Perhaps the most frustrating aspect of the respondent's conduct and testimony is her self-perceived heroism in the face of such absolute dereliction of her duties to her client and her utter lack of competency as a lawyer in general. Before the HPS, the respondent alternately testified as the foremost authority on all things abuse and neglect, yet she appeared to be intellectually stymied by the perceived lack of procedure to address her concerns with the DHHR. The respondent complained that she did not know how to utilize an extraordinary writ (as recommended by this Court in its memorandum decision on the Rule to Show Cause), despite a full discussion of it in the Bench and Bar practice treatise she boasted was downloaded

onto her computer. More specifically, however, the respondent bemoaned the fact that she could not discuss the matter with her mother, the sitting Mingo County Circuit Court judge, due to confidentiality concerns. As should be apparent to even a casual observer, discussion of systemic and administrative issues within a State agency (which, if true, would be equally familiar to a sitting circuit judge) in no way implicates confidentiality concerns. If the issues at Mingo County DHHR were as pervasive and administratively-driven as the respondent suggests, there would have been no need whatsoever to disclose any case-specific, confidential information to at least discuss possible recourse with a sitting circuit court judge. Any sitting circuit court judge has, at his or her fingertips, a wealth of support available through this body and its administrative arm to address concerns which may arise, particularly in the heavily-resourced juvenile arena. The respondent apparently made no attempt whatsoever to avail herself of available resources. For the respondent to suggest that her behavior is excused by an unselfish motive confounded by lack of access or resources is patently absurd.

### III.

Having examined the respondent's inexplicable conduct to the extent discernible, the issue remains: what type of sanction is appropriate? The majority opinion empathizes with the respondent's loss of court-appointed work and the commensurate reduction in income as a result of the contempt order. However, in the opening paragraph of the respondent's brief to this Court in this disciplinary case, she indicated that she also "maintained a lively and profitable personal injury practice." The respondent also noted that she voluntarily changed her status to "inactive" with the West Virginia State Bar after she was held in contempt. Ostensibly

no longer a possibility.... So it's just having your parent is very important."

**3.** In her Answer to the ODC complaint, the respondent stated that by the time her briefs were due she "was no longer confident that I had made the right choice [to recommend termination] because the DHHR's work and word to me was [sic] no longer reliable." In the same

document, however, the respondent later stated that "too much had transpired to believe Mom could be successful." In fact, the respondent's appellate briefs as to both the mother and father, filed well after the respondent's supposed concerns arose, fully supported termination without referencing any second thoughts.

before she became inactive, however, the respondent's answer to the ODC's complaint indicated that since eliminating court appointments, her "life and practice have improved dramatically." Therefore, any reduction in income occasioned by the temporary prohibition on court-appointed work would therefore appear to be the result of the respondent's inactive status and/or failure to augment other portions of her practice. Based on the respondent's own characterization of her practice, there is no reason why she could not have modified it to increase her personal injury or other non-court-appointed practice areas to close any gap in business, thereby realizing a self-described "dramatic improvement" in her life and practice.

To that end, while pro bono and court-appointed work are a vital part of our legal system and such work is the affirmative obligation of every lawyer admitted to the Bar, it is likewise a privilege. Clients receiving court-appointed counsel have no right of selection; it is therefore the obligation of the judiciary to ensure that they are appointed competent representation. Attorneys admitted to practice before our Bar have no entitlement to court-appointed work and to the extent they structure their practice around such work, they are well-advised to ensure that they are qualified and diligent.

Moreover, particularly as pertains to guardians ad litem, practitioners must be mindful that "a guardian *ad litem* has a duty to represent the child(ren) to whom he or she has been appointed, as effectively as if the guardian *ad litem* were in a normal lawyer-client relationship." *Matter of Scottie D.*, 185 W.Va. 191, 198, 406 S.E.2d 214, 221 (1991). It is beyond cavil that attorneys representing infant clients must adhere to the highest possible standards of professional conduct and clothe themselves in the prescribed roles of advisor, advocate, negotiator, and evaluator. The "Guidelines for Children's Guardians ad Litem in Child Abuse and Neglect Cases" describe a guardian ad litem's mini-mal obligations to his or her client and form an additional layer of appointment-specific duties and protections for the infant. *See* Rules of Procedure for Child Abuse and Neglect, Appendix A. The respondent's inexcusable actions failed her infant client when her representation was most critical. "The safety, well-being, and timely permanent placement of a child in an abuse and neglect proceeding are central to all aspects of a GAL's representation." *Id.* Section A(1).

Returning now to the issue of an appropriate sanction, I wholly reject the application of other cases involving the failure of guardians ad litem to file timely briefs on the basis of simple neglect. As this Court has held:

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

Syl. Pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998). The respondent's conduct in this matter was intentional, highly detrimental to her client and others, and without rational justification. The emotional turmoil occasioned by her single-minded view of her own motivations is immeasurable. Moreover, the respondent continues to demonstrate a lack of understanding of the full impact of her dereliction of her duties to her infant client and the bizarrely ill-conceived "mission" which held her client's permanency hostage.[4]

---

4. Even before the HPS, the respondent remained fixated on the DHHR rather than her own malfeasance. She was apparently dismayed that this Court did not allow her to use the rule to show cause to vent about the DHHR:

Q. Okay. And you heard Judge Cummings' testimony, saying that he told you not to proceed in this manner?

A. He did, but he gave me no alternative. It's like—you know, and I said that at the

The respondent's actions demonstrate not only a lack of competence, but a compounding and devastating lack of judgment that I hesitate to recommend returning to the legal community. This absence of judgment is demonstrated not merely in the underlying matter, but in the respondent's continued conduct throughout these proceedings in her written responses, oral presentation, and testimony. Unlike cases involving inadvertence, neglect, or even dishonesty, an absence of judgment is not easily remedied or susceptible to simple behavior modification.

As I indicated at the outset, the Court has not been presented with a lawyer disciplinary case involving even remotely comparable facts. While the respondent did not commit criminal activity, her conduct and stated rationale certainly escalates the discipline appropriate in a typical lack of diligence or competence matter. The ODC proffers that *Lawyer Disciplinary Board v. Hardin*, 217 W.Va. 659, 619 S.E.2d 172 (2005), is comparable inasmuch as it resulted in a two-year suspension for a lawyer's consistent failure to follow court orders, resulting in the dismissal of a civil action with prejudice. While the refusal to comply with court orders is comparable, the respondent's actions resulted in delay rather than an extinguishment of rights. On the other hand, the client in this matter—an infant of tender years—and the heightened importance of the underlying abuse and neglect matter are somewhat offsetting of that incongruity. Moreover, the respondent's incomprehensible rationale for her actions is a significant aggravating factor, yet her relative inexperience in the practice of law mitigates. On balance, I believe the respondent's actions warrant an eighteen-month suspension, to be followed by two years of supervised practice, as well as the other sanctions adopted by the majority. Incredibly, however, the majority refuses to impose the most critical sanction, *i.e.*, the respondent's continued absolute prohibition on accepting court-appointed work in abuse and neglect and family law cases.

My opinion on the appropriate discipline for the respondent is based entirely upon her conduct throughout this matter and its impact, particularly given the serious nature of abuse and neglect matters. That being said, however, I would be remiss if I failed to note that lawyer discipline serves the equally important purpose of deterrence to other members of the Bar. *See* Syl. Pt. 3, *Committee on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987) ("In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.").

IV.

Few could doubt that the most valuable resource of a self-governing society is its population of children who will one day become adults and themselves assume the responsibility of self-governance. A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. Thus, the whole community has an interest that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed ... citizens.

*Santosky*, 455 U.S. at 790, 102 S.Ct. 1388 (citations and internal quotation marks omitted) (Rehnquist, J., dissenting). Practitioners who conscientiously and dutifully engage in the vitally important work of protecting our children from abuses, and who help these children grow into independent, well-developed citizens, expect this Court to uphold the high standards of commitment and competence they demonstrate. To those children who tragically require these lawyers' services, this Court owes nothing less. Accordingly, I respectfully dissent.

Supreme Court, too. Mennis [sic] Ketchum said, you know, we go through thousands of these every year, you just—you file your answer, you need to get these done, but then I'm like well, what solves what I'm complaining about?

WORKMAN, J., concurring in part and dissenting in part:

It is disheartening that the majority has chosen to prioritize protecting the financial interests of a member of the bar over the protection of the children of Mingo County. This case cries out for the application of Syllabus Point 2 of *In re Daniel*, 153 W.Va. 839, 173 S.E.2d 153 (1970): "Disbarment of an attorney to practice law is not used solely to punish the attorney but is *for the protection of the public* and the profession." (emphasis added). While I concur in the three-month suspension imposed by the majority, its refusal to bar respondent from hereafter representing court-appointed infants in abuse and neglect and family court matters is irresponsible and dangerous to the weakest, most voiceless group of children in society. The respondent's offense in this matter is not merely an untimely filing, which this Court unfortunately sees regularly. Rather, it is conduct so completely lacking in the judgment and competence needed to properly protect these most vulnerable clients that it calls for an individualized sanction designed not to be overly punitive to the lawyer, but to protect these vulnerable children. Accordingly, while I concur in the suspension issued by the majority, I would permanently bar respondent from taking court appointments as guardian ad litem in abuse/neglect and family law matters. I would further require that she petition for reinstatement and undergo one year of supervised practice subsequent to any reinstatement. Critically, due to the unique circumstances presented in this case, I would also require respondent to undergo a psychological evaluation prior to any petition for reinstatement.

Respondent in this matter willfully refused to file a brief on behalf of her infant client in a pending abuse and neglect appeal.[1] She explained that she did so in a purported attempt to garner this Court's attention regarding what she perceived were inadequacies with the Mingo County Department of Health and Human Resources ("DHHR"). This puzzling "explanation," however, was not the first nor last offered by respondent. Initially, she claimed she simply was unaware of the appeal due to staffing issues and stated as much in her first response to this Court's rule to show cause. The day before argument on the rule, however, she changed her story, stating that her failure to file a brief was deliberate and for the purpose of gaining an audience with the Court to air her grievances about DHHR. Before the Hearing Panel Subcommittee ("HPS"), respondent then began to alternate between this justification and some intimation that she had actually reconsidered her position on the propriety of termination of the parental rights in the appeal and therefore was uncertain what position to adopt in her brief. Respondent offered further non-specific rationalizations of her behavior to the effect that she was "crazy," "dug in," and emotionally affected by the trauma of her sister's death. At this point, because of respondent's vacillating reasons, it is unclear precisely what type of conduct or issues this Court's discipline should even attempt to address: self-aggrandizing delusion, simple neglect, gross incompetence, a lapse in judgment, or emotional issues.

What is clear, however, is that respondent fails entirely—even at this juncture—to appreciate the significance and inappropriateness of her actions, as my colleague Chief Justice Loughry details at length. Respondent's conduct did not simply delay "paper-

---

1. Respondent's brief was initially due on May 20, 2015. On May 22, 2015, a member of this Court's Clerk's office left a message with respondent's office advising her brief was past due. On May 27, 2015, this Court issued a notice of intent to sanction ordering respondent to file a brief on or before June 1, 2015. On June 5, 2015, a member of the Clerk's office sent an email to respondent advising of the Notice of Intent to Sanction, to which respondent replied that she was unaware of the appeal, but would address it that day. On June 11, 2015, this Court issued a rule to show cause, receipt of which respondent acknowledged by her return receipt signature on June 17, 2015. Having still received no brief and in view of the pending rule to show cause, this Court's Clerk's office again telephoned respondent's office on July 5, 2015, July 23, 2015, August 7, 2015, August 14, 2015, and August 31, 2015, to inquire about respondent's brief. On September 1, 2015—nearly three and a half months after it was originally due and after *nine* separate communications from this Court—respondent filed a motion to file her brief out of time and an accompanying, one-page brief.

work," as she stated in her response to the rule to show cause, but the permanence of a family unit desperately needed for a child so young.[2] Such a lack of regard for the effect these proceedings have on children, parents, and adoptive families or other permanency arrangements demonstrates a lack of understanding of the very values our abuse and neglect system seeks to preserve. As the United States Supreme Court has explained:

> [T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot(ing) a way of life" through the instruction of children, as well as from the fact of blood relationship. No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship. At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals.

*Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816, 844, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (citations omitted). Moreover, this Court long-ago observed that

> the early, most formative years of a child's life are crucial to his or her development. There would be no adequate remedy at law for these children were they permitted to continue in this abyss of uncertainty. We have repeatedly emphasized that children have a right to resolution of their life situations, to a basic level of nurturance, protection, and security, and to a permanent placement.

*State ex rel. Amy M. v. Kaufman*, 196 W.Va. 251, 257, 470 S.E.2d 205, 211 (1996) (citing *In re Carlita B.*, 185 W.Va. 613, 623, 408 S.E.2d 365, 375 (1991)).

Furthermore, respondent's suggestion that because the child was, in fact, an infant and therefore did not realize or understand any delay because he was with his planned adoptive family is a disturbingly myopic view of our abuse and neglect system. As described through the testimony of the adoptive parents, respondent's audacious refusal to file a brief in her client's matter complicated obtaining critical medical treatment for the infant. It created extreme anxiety for a mother and father who had fostered this child since he was four months old and were, in every sense, his parents. The fear they articulated before the HPS about the potential for a previously-disinterested relative to suddenly appear and potentially derail the child's life and their adoption plans, tearing their family asunder, was emotional and heart-breaking. The dissolution and re-establishment of familial units occasioned by our abuse and neglect system occupy "a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility." *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 38, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (Blackmun, J., dissenting). In this or a similar future case, the proceedings may not result in termination of parental rights and the longer a child spends bonding with one family before unceremoniously being removed and placed with an entirely different family, the greater the short-term and long-term emotional harm to that child. To dismissively minimize the effect of her delay demonstrates respondent's complete lack of appreciation for the real people and real lives affected daily by these proceedings. In my opinion, anyone who demonstrates this attitude or this level of incompetence should quite simply not be appointed by the court system to represent these vulnerable children. Accordingly, this Court's sanctions should have included a prohibition from acting as guardian ad litem in abuse and neglect

---

**2.** As detailed by Chief Justice Loughry, respondent indicated that the delay in permanency she caused "suck[ed]" and that she regretted that her delay may have precluded the adoptive parents from having an "enjoyable summer."

and family law matters[3] in the future, as expressly permitted by West Virginia Rule of Lawyer Disciplinary Procedure 3.15: "[T]he Supreme Court of Appeals may impose any one or more of the following sanctions for a violation of the Rules of Professional Conduct .... (3) limitation on the nature or extent of future practice[.]"

However, the majority appears curiously preoccupied with respondent's future practice and resultant personal economic consequences were this Court to continue its bar against her work as guardian ad litem. The majority should be more concerned about the safety of abused and neglected children in Mingo County rather than the protection of the lawyer's income. I will not belabor the obviously distorted priorities that this reflects, or the ostensible attitude that this level of representation is "good enough" for the children of Mingo County. Instead, I focus on how this concern about respondent's practice is not only inappropriate but also patently wrong. The majority indicates that the approximate seventeen-month ban on abuse and neglect appointments preceding this matter[4] has occasioned a 90% decrease in respondent's income. As a result, the majority seemingly appears concerned that a future prohibition on guardian ad litem work would effectively "wipe out" respondent's practice, gravely noting the "less satisfactory office space" and reduction in staff caused by the "embargo" on her appointed work. In fact, respondent herself suggested as much in her brief before this Court.[5]

It is clear, however, that this reduction in income is occasioned by two more obvious factors that for some reason the majority fails to recognize: 1) respondent's self-imposed withdrawal from practice by going "inactive" with the State Bar after this Court held her in contempt in September 2015[6]; and 2) her inability to receive court appointments from the sitting Mingo County Circuit Judge, who is her mother. The majority completely overlooks respondent's admission that she went "inactive" when she was held in contempt. Frankly, this should have resulted in a 100% reduction in her practice and income, yet somehow she maintains that was merely 90%. Moreover, respondent herself admits that as of 2015 when her mother was appointed and subsequently elected to the circuit court, she could no longer receive court appointments.[7] It would appear then, due to the lapse of time, that respondent is just now realizing the effects of this attrition on her caseload and income.

More importantly, any histrionics suggesting that a ban on future guardian ad litem appointments would be devastating to respondent's practice are completely unfounded. Respondent herself stated she enjoyed a "lively and profitable personal injury practice." In fact, she previously appeared before

---

**3.** *See* West Virginia Rules of Practice and Procedure for Family Court, "Appendix B: *Guidelines for Guardians ad Litem in Family Court*" ("Courts shall not routinely assign guardians ad litem for children or require court-ordered investigations unless the court has reasonable cause to suspect the parenting issues involve a child's safety or the best interest of the child warrants further investigation by the court.... Provided, however, that when serious allegations of abuse and neglect or issues relating to the child's health and safety are raised, the family court shall appoint a guardian ad litem."). *But see* Order Re: Request for Public Comment and Provisional Approval of Proposed Amendments to Certain Guardian Ad Litem Rules for Family Court, Docket No. 17–Rules–02 (March 8, 2017) (http://www.courtswv.gov/legal-community/requests-for-comment.html).

**4.** This prohibition was part of the Court's sanction upon finding respondent in contempt.

**5.** What respondent actually stated, however, was that the combined effect of the contempt order, preclusion from federal court appointments, and being the "subject of media attention local and State-wide" reduced her caseload ninety percent.

**6.** In her brief, respondent states in footnote five: "Lauren Thompson has withdrawn from her practice and active membership in the West Virginia State Bar since the Court's Order holding her in contempt." The memorandum decision holding her in contempt was filed on September 30, 2015.

**7.** Respondent continued, however, to receive appointments from the recusal judge assigned to Mingo County for matters her mother could not hear as a result of her prior work as a family law judge. The number of those matters, obviously, would have been at their highest number when her mother was first appointed and will necessarily continue to wane over time.

this Court on a breach of contract action.[8] Respondent stated in her affidavit to this Court, "I take nearly a third as much pro bono work as I do retained work." Not only would this one-third also apparently include criminal appointments—which she could continue to do—but plainly reveals that the majority of respondent's practice was *not* in fact guardian ad litem work. How respondent or other members of this Court manage to equate 90% with one-third is unclear. Finally, respondent herself stated that she had no intention of accepting future abuse and neglect appointments and is much happier with her "life and practice" (such as it could possibly be given that she is "inactive" with the Bar) without such work.[9]

There can be no question that court-appointed infant clients in abuse and neglect matters are the most vulnerable victims in our judicial system. They deserve the very best of any lawyer who is appointed as a guardian ad litem: the most conscientious, deliberate, thoughtful, and mature representation. These children should not be relegated to those unable—either emotionally or professionally—to represent their interests with a high degree of competence, compassion, and vigor. Nor should they be placed at the bottom of the heap in this Court's prioritization of the importance of the protection of the public generally. Tragically, these proceedings all too frequently have life-or-death consequences, as illustrated in many cases where children have died as the result of abuse and/or neglect.[10] The majority's refusal to act in a manner which protects abused and neglected children from inadequate representation minimizes the profound, real-life consequences of our actions in cases such as this. These children helplessly rely on their court-appointed counsel to speak on their behalf and hold their interests paramount. When a lawyer demonstrates an egregious failure or refusal to do so and this Court does not take measures to ensure it does not happen again, we abdicate our duty to the public and potentially make the judicial system complicit in death or serious injury to children. It is because of the paramount importance of these interests and respondent's utter disregard of them that I would permanently bar her from taking court appointments as guardian ad litem in *both* abuse and neglect and family law matters.[11] Because of the seriousness of her conduct, I would further require that she petition for reinstatement and undergo one year supervised practice subsequent to any reinstatement. The majority's refusal to impose any of these additional sanctions—particularly supervised practice— is quite notably disparate from other similar offenders.[12] *See Lawyer Disciplinary Board*

---

**8.** *Beverly v. Thompson*, 229 W.Va. 684, 735 S.E.2d 559 (2012).

**9.** In her affidavit, respondent unequivocally stated, "I will never accept any Guardian Ad Litem appointments for children again."

**10.** *See State v. Souther*, No. 15-1241, 2017 WL 969145 (W. Va. March 13, 2017); *State v. Louk*, 237 W.Va. 200, 786 S.E.2d 219 (2016); *State v. McDaniel*, 238 W.Va. 61, 792 S.E.2d 72 (2016); *State v. Cassidy B.*, No. 15-0404, 2016 WL 2977309 (W. Va. May 23, 2016); *In re S.J.*, No. 15-0043, 2015 WL 3687807 (W. Va. June 15, 2015); *State v. Rogers*, No. 14-0373, 2015 WL 869323 (W. Va. January 9, 2015); *In re S.W.*, 233 W.Va. 91, 755 S.E.2d 8 (2014); *State v. Skupnick*, No. 13-0746, 2014 WL 2463002 (W. Va. June 2, 2014); *State v. Chic–Colbert*, 231 W.Va. 749, 749 S.E.2d 642 (2013); *State v. Meadows*, 231 W.Va. 10, 743 S.E.2d 318 (2013); *State v. Linger*, No. 11-1686, 2013 WL 1501422 (W. Va. April 12, 2013); *In re D.R.*, No. 12-0848, 2012 WL 5851934 (W. Va. November 19, 2012); *In re A.H.*, No. 12-0225, 2012 WL 3155738 (W. Va. June 25, 2012); *State v. Hunter*, No. 11-0633, 2012 WL 2914284 (W. Va. February 13, 2012);

*State v. Jenkins*, 229 W.Va. 415, 729 S.E.2d 250 (2012); *State v. Thornton*, 228 W.Va. 449, 720 S.E.2d 572 (2011); *State v. Thompson*, 220 W.Va. 246, 647 S.E.2d 526 (2007); *State v. Mongold*, 220 W.Va. 259, 647 S.E.2d 539 (2007); *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997); *West Virginia Dept. of Health and Human Resources ex rel. Wright v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996); *In re Brianna Elizabeth M.*, 192 W.Va. 363, 452 S.E.2d 454 (1994); *State v. Jessica M.*, 191 W.Va. 302, 445 S.E.2d 243 (1994).

**11.** As previously stated, this prohibition would not include criminal appointments. Unlike children, an adult criminal defendant, in the event his or her lawyer fails to adequately represent his or her interests, has the means with which to communicate with his lawyer about such inadequacies or, failing other measures, could communicate about such inadequacies with Office of Disciplinary Counsel or the Court.

**12.** The majority should not need to be reminded that consistency and fairness in lawyer disciplinary matters should be of paramount importance

*v. Palmer,* No. 15–0977, slip op., 238 W.Va. 688, 798 S.E.2d 610, 2017 WL 1345263 (W. Va. April 6, 2017) (requiring six-months' supervision following thirty–day suspension); *Lawyer Disciplinary Board v. Sturm,* 237 W.Va. 115, 785 S.E.2d 821 (2016) (requiring two-years' supervision following ninety-day suspension), *Lawyer Disciplinary Board v. Thorn,* 236 W.Va. 681, 783 S.E.2d 321 (2016) (requiring one-year supervision following one-year suspension); *Lawyer Disciplinary Board v. Conner,* 234 W.Va. 648, 769 S.E.2d 25 (2015) (requiring two-years' supervision following ninety-day suspension). Perhaps the majority somehow observes a "Mingo County exception."

Finally, as indicated above, I further believe the peculiar circumstances of this case require the not uncommon sanction that respondent be required to undergo a psychological evaluation. My recommendation in this regard is in no way designed to embarrass or humiliate respondent, but is borne out of a sincere concern for her mental and emotional well-being—both matters which she squarely placed into issue in this matter in defense of her conduct. Respondent's counsel suggested before the HPS and in briefs to this Court that respondent's judgment and behavior during the pertinent time period were affected by her sister's untimely death.[13] It is understandable that grief can affect one's ability to practice law; however, to the extent it has affected respondent, it should be dealt with before she returns to practice. Moreover, to whatever extent her family tragedy was not the reason for her

poor judgment, it is clear that respondent's bizarre perception of the events culminating in this matter necessitates an evaluation of her psychological well-being. Respondent's belief that it was appropriate to use this child and family as an "example" to vindicate her perceived shortcomings with DHHR is troubling. This is not only troubling to the extent that respondent regarded this child's case as the "sacrificial lamb" to address these issues, but even more so in that she even failed to follow through with this purported goal altogether. The contempt shown to this Court through her continual disregard of its orders and attempts at contact is something to which, unfortunately, this Court is no stranger. However, respondent's conduct was amplified by her mystifying belief that the rule to show cause was tantamount to being the Court's invited guest for the purpose of enlightening us with her thoughts and concerns about DHHR, none of which ever materialized. These injudicious, if not absurd, decisions and perceptions by a practicing attorney are so confounding as to require further evaluation.

Accordingly, I respectfully concur in part and dissent in part.

---

to the Court. *See Lawyer Disciplinary Bd. v. Grindo,* 231 W.Va. 365, 370, 745 S.E.2d 256, 261 (2013) (noting that disciplinary factors are designed for the purpose of "achieving both consistency and fairness in lawyer disciplinary matters").

**13.** Notably, however, respondent made little to no mention of this circumstance in the myriad

written and oral explanations offered in the underlying matter.